ב"ה

Levi Y. Silver (LS6546)
lsilver@silverlawfirm.com
**SILVER & SILVER APC**
245 West 17th Street, 5th Floor
New York, New York 10011
Telephone:  (212) 851-6428
Facsimile:  (619) 231-1616

Elie C. Poltorak (EP0770)
elie@poltoraklaw.com
**POLTORAK PC**
1650 Eastern Parkway, Suite 400
Brooklyn, NY 11233
Telephone: (718) 943-8815
Facsimile: (718) 943-8816

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GENERAL PATENT CORPORATION, | Case No. 1:11-cv-06585 (JFK) |
| Plaintiff, | |
| -against- | **COMPLAINT FOR  INJUNCTIVE RELIEF AND DAMAGES** |
| WI-LAN INC., GLADIOS IP INC., and PAUL J. LERNER, ESQ. | |
| Defendants. | |

Plaintiff General Patent Corporation ("GPC"), by and through its undersigned attorneys, as and for its Complaint against Defendants Wi-LAN Inc. ("WiLAN"), Gladios IP Inc. ("Gladios") and Paul J. Lerner, Esq. ("Lerner") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ACTION

1.      This lawsuit arises out of WiLAN's fraudulent and unlawful scheme to compete with GPC by misappropriating GPC's highly confidential information, as well as soliciting its second most senior employee, Lerner, in breach of its contractual obligations.  Having tried, but

failed, to lawfully replicate the highly successful business model that GPC pioneered close to 25 years ago and thereafter continued to refine and perfect, WiLAN instead opted to steal it.  As explained below, WiLAN gained access to the confidential and proprietary information that made GPC's business model so successful by feigning an interest in acquiring GPC *while it knew that it could never consummate the acquisition*.  After it had gained virtually unfettered access to GPC's highly confidential information, WiLAN abruptly called off its acquisition of GPC and announced that it was opening a new office not far from GPC's headquarters, which would be headed by Lerner and compete directly with GPC.

2.      GPC brings this action as a result of, among other things:  (i) WiLAN's fraud; (ii) Lerner's breach of the confidentiality and non-competition covenants he entered as a condition of his employment with GPC; (iii) WiLAN's breach of the non-solicitation agreement it entered in order to gain access to GPC's confidential information; and (iv) WiLAN's failure to negotiate in good faith, as required by the term sheet between the parties.  GPC seeks compensatory damages, punitive damages, and preliminary and permanent injunctive relief against Defendants based on:  (i) breach of contract; (ii) fraud; (iii) breach of the implied covenant of good faith and fair dealing; (iv) tortious interference with contract; (v) breach of fiduciary duty; (vi) aiding and abetting breach of fiduciary duty; and (vii) unfair competition.

## PARTIES

3.      Plaintiff GPC is a corporation incorporated under the laws of the State of New York and having a principal office at Montebello Park, 75 Montebello Road, Suffern, NY 10901.

4.      Upon information and belief, defendant WiLAN is a corporation incorporated under the laws of Canada, having a principal office at 11 Holland Avenue, Suite 608, Ottawa, Ontario K1Y 4S1, Canada.  According to its 2010 Annual Report and its website, WiLAN is primarily engaged in the business of acquiring and assertively licensing patents.

2

5.     Upon information and belief, Defendant Gladios is a corporation that is a wholly-owned subsidiary of WiLAN, having a principal office at 1620 Scott Street, Suite 15, Ottawa, Ontario K1Y 4S1, Canada.  According to its website and WiLAN's 2010 Annual Report, Gladios is primarily engaged in the business of partnering with patent owners that wish to monetize their intellectual property by means of patent licensing and enforcement.  Gladios operates on a contingency basis, in which the original patent owners retain ownership of their patents, while Gladios manages and finances the patent licensing and enforcement campaign in return for a share of the revenues.

6.     Defendant Lerner is an individual residing at 7 White Birch Road, Madison, Connecticut 06443.  Lerner is an attorney admitted to practice in New York.  Lerner was employed by GPC since 1999 and, until September 5, 2011, held the title of Director, Senior Vice President and General Counsel.  Lerner is also a shareholder in GPC owning 20,000 shares of common stock, which represents approximately 2% of GPC's outstanding shares.  Upon information and belief, Lerner became an employee of WiLAN and Gladios on or about September 6, 2011.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1332(a)(3) in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states and in which citizens or subjects of a foreign state are additional parties.

8.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred there.  Additionally, Defendants WiLAN and Gladios submitted to this Court's jurisdiction in the several agreements entered between the parties.

3

## FACTUAL ALLEGATIONS

**GPC's Business and the GPC Trade Secrets**

9.      GPC is "a leading patent licensing and enforcement firm"—as acknowledged by WiLAN in a press release issued on or about September 12, 2011.  Upon information and belief, GPC was the first such company in the United States and, likely, the world.  GPC pioneered its business model almost 25 years ago and has been the premier player in the patent licensing industry ever since.

10.      GPC's primary business focus is to partner with patent owners in order to license and enforce their patents.  GPC operates on a on a contingency basis, in which it finances and manages patent licensing and enforcement campaigns against suspected infringers, in return for an ownership interest in the underlying patents entitling it to a share of the proceeds.

11.      GPC maintains its status as a leading patent licensing and enforcement company through an array of carefully honed and confidential business strategies, including, among other things:  (i) a unique and confidential internet-based marketing strategy tailored for a contingency based patent licensing and enforcement business that is responsible for the bulk of GPC's deal-flow and which was developed over time at great expense and effort; (ii) various secondary online and traditional marketing strategies and techniques tailored for a contingency based patent licensing and enforcement business, including but not limited to various advertising venues, public relations campaigns, direct mailings, trade show participations and/or exhibitions, and viral marketing campaigns; (iii) confidential business development and partnering strategies, including various strategies uniquely geared toward a contingency-based patent licensing and enforcement business; (iv) a network of affiliates that GPC spent many years building, including patent attorneys, patent agents, licensing professionals and other individuals who source and refer prospective clients to GPC; (v) unique compensation arrangements with affiliates; (vi)

unique strategies developed over the course of many years for selecting patents GPC accepts for

licensing and enforcement from among the hundreds of submissions it reviews each year, and

specific criteria for streamlining the patent selection process, including a confidential, detailed

procedure that is followed in conducting initial analysis and subsequent in-depth due diligence

on patents; (vii) well developed relationships that took years to cultivate with a number of

outside vendors that play a crucial role in GPC's success, including reverse-engineering firms,

offshore patent investigation firms,  and U.S. patent attorneys who assist GPC in assessing the

strength of submitted patents; (viii) unique business models geared toward various sorts of patent

holders, including individual inventors and other non-practicing entities, practicing entities, and

universities; (ix) various crucial relationships necessary for enforcing patents against suspected

infringers with little up-front capital investment that were cultivated over the course of many

years, including, relationships with prominent law firms that litigate cases enforcing patents in

which GPC has an ownership interest on a contingency basis, including law firms that do not

publicly hold themselves out as willing to handle such cases on a contingency basis; (x) a

unique, cost-effective, and confidential contingency formula for compensating outside counsel;

(xi) relationships with local counsel in GPC's forums of choice for litigating patent infringement

cases; (xii) confidential, proprietary patent litigation strategies developed by GPC based in part

on game theory, real options theory, and practical litigation experience; (xiii) elaborate and

confidential litigation risk management techniques, such as proprietary decision tree analysis

templates; (xiv) well-developed relationships with lenders willing to finance out-of-pocket patent

litigation expenses; (xv) a proprietary set of documents governing the unique structure of GPC's

relationship with clients, which are unknown to GPC's competitors; (xvi) licensing terms that

GPC offers prospective licensees; (xvii) proprietary negotiation strategies; and (xviii) other proprietary know-how (collectively, the "GPC Trade Secrets").

12.       The GPC Trade Secrets were developed by GPC over a long period of time—almost a quarter century—at great expense and effort.  The GPC Trade Secrets are vital to GPC and would be highly valuable to GPC's many competitors, to GPC's detriment.  GPC takes extensive measures to guard the secrecy of the GPC Trade Secrets, including by entering confidentiality agreements with any employees or strategic partners that are likely to gain access to such information.  The GPC Trade Secrets are not generally known outside of GPC and significant safeguards are in place to prevent the disclosure of the GPC Trade Secrets.  The GPC Trade Secrets cannot easily be properly acquired or duplicated by others.

**The Lerner Non-Compete**

13.       As a result of his position with GPC as Senior Vice President, General Counsel, and a member of the Board of Directors and the Executive Committee, Lerner was necessarily privy to all, or virtually all, of the GPC Trade Secrets.

14.       In order to protect GPC from potential disclosure and illicit use of the GPC Trade Secrets, Lerner and GPC entered into a Confidentiality and Noncompetition Agreement, dated January 5, 2004 (the "Lerner Non-Compete").

15.       The Lerner Non-Compete was drafted by Lerner in his capacity as General Counsel of GPC.

16.       Lerner expressly acknowledged in the Lerner Non-Compete that GPC's confidential information "constitutes valuable intellectual property" of GPC and that Lerner would have access to such confidential information during the course of his employment with GPC.  Lerner further acknowledged that GPC would suffer irreparable harm if he breached, or threatened to breach, the Lerner Non-Compete.  Further, Lerner agreed that GPC would "be

entitled to seek injunctive relief, both preliminary and permanent, enjoining and restraining such breach or threatened breach."

17.     The Lerner Non-Compete prohibited Lerner, during and after the term of his employment, from, directly or indirectly, using, disseminating, or disclosing to any person, firm or other business entity for any purpose whatsoever any "Confidential Information."  The Lerner Non-Compete defined "Confidential Information" as "information, not known to the general public or in the industry in which [GPC] is engaged, including but not limited to information about [GPC]'s processes, clients, services, methods, suppliers, affiliates, pricing policies and related matters, including trade secrets and know-how," with certain limited exceptions.

18.     The Lerner Non-Compete also prevented Lerner from working for any competitor of GPC within the United States for one year following any termination of his employment with GPC, unless his employment was unilaterally terminated by GPC without "Cause."

**WiLAN's Unsuccessful Attempt to Legitimately Enter the Partnership Licensing Business**

19.     The business model of WiLAN differs from that of GPC.  WiLAN *buys* patents for purposes of licensing and enforcement.  GPC, on the other hand, partners with patent owners to monetize their patents on a revenue-sharing basis.  In 2010, WiLAN attempted to enter the *partnership*-based licensing business through its wholly-owned subsidiary, Gladios.

20.     These attempts were largely unsuccessful.  Lacking GPC's trade secrets and know-how, Gladios was unable to either generate a substantial deal-flow or effectively monetize its clients' patents.

21.     On or about March 29, 2011, WiLAN's CEO, James Skippen ("Skippen"), stated to GPC's Chairman and CEO, Alexander Poltorak ("Poltorak"), that Gladios was a failure.

**WiLAN's Fraudulent Scheme to Misappropriate GPC's Trade Secrets**

22.     In or about April, 2010, GPC began seeking potential strategic partners to invest in or acquire GPC.

23.     In connection with said search, GPC retained the investment banking firm Houlihan Lokey Capital, Inc., ("Houlihan").

24.     Houlihan sent a one page description of GPC, known as a "teaser," to various entities it believed might be interested in investing in or acquiring GPC.  Any interested party was required to execute a confidentiality agreement, upon which Houlihan would send them a Confidential Information Memorandum ("CIM") providing further information about GPC.

25.     Lerner was listed in the CIM as a Director, Senior Vice President and General Counsel of GPC.  Lerner reviewed and approved several drafts of the CIM in or about September, October and November of 2010.

26.     WiLAN was among the parties approached by Houlihan as a prospective investor/acquirer.

27.     On or about November 16, 2010, WiLAN entered into a Confidentiality Agreement with GPC (the "Confidentiality Agreement").

28.     Pursuant to the Confidentiality Agreement, WiLAN was prohibited from:  (i) using the information provided by GPC for any purpose other than evaluating the proposed transaction; or (ii) soliciting GPC's employees for employment for a two year period (the "WiLAN Nonsolicitation").

29.     Upon execution of the Confidentiality Agreement, Houlihan furnished the CIM to WiLAN.  The CIM provided an overview of GPC's business, including its history, strategic focus, financial performance, background of key employees, marketing strategies, organizational structure, and patent holdings.  Specifically, the CIM provided a summary of each patent

portfolio that was deemed to be valuable by GPC. These summaries described the patented technology, licensing efforts, and the products that were thought to be infringing on the patents.

30.    In or about January, 2011, GPC received preliminary non-binding expressions of interest from several parties, including WiLAN.

31.    On or about February 14, 2011, WiLAN demanded more detailed information on GPC than that provided in the CIM. Specifically, WiLAN requested more comprehensive confidential and privileged information on the patents in which GPC held an interest.

32.    On or about February 22, 2011, GPC sent WiLAN a list of its revenue-generating patent portfolios, indicating for each portfolio how much revenue had been derived and whether there remained any potential for further revenue.

33.    On or about February 22, 2011, WiLAN sent representatives to visit GPC for the purported purpose of assessing the desirability of the Acquisition. WiLAN also sent a list of topics on which it wanted more information, which included: (i) corporate and financial information; (ii) the background of GPC's employees, as well as their compensation, and motivation to remain with the business post-Acquisition; (iii) GPC's existing patent portfolios; and (iv) the pipeline of patents being submitted to GPC for consideration by prospective clients.

34.    On or about March 8, 2011, GPC and WiLAN executed a Non-Disclosure and Common Legal Interest Agreement (the "WiLAN NDA"). Pursuant to the terms of the WiLAN NDA, GPC agreed to provide such highly-confidential information to WiLAN on the basis that "the Parties intend[ed] to enter into a relationship whereby WiLAN may acquire ownership interests for the purposes of enforcement in some or all of" GPC's patents.

35.    Upon execution of the WiLAN NDA, GPC furnished WiLAN with (i) comprehensive, highly confidential, and privileged information on the patents in which GPC had

an interest; and (ii) access to GPC's employees who were knowledgeable regarding such patents and GPC's efforts to license and enforce them.

36.     Thereafter, WiLAN's representatives again visited GPC on or about March 10, 2011, during which visit they heard presentations from GPC's CEO and other employees and had ample opportunity to ask questions about GPC, its strategy, employees, and patent portfolios.

37.     On or about March 29, 2011 WiLAN CEO Skippen and WiLAN's CFO, Shaun McEwan, visited GPC's headquarters in Suffern, New York.

38.     On or about April 8, 2011, WiLAN offered to acquire a 100% of GPC.

39.     The parties reached agreement on material terms of the acquisition, which were memorialized in a Confidential Term Sheet, dated April 29, 2011 (the "Term Sheet"), which required the parties to "use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement…."

40.     The Term Sheet also contained "no shop" provisions, which required GPC to cease all discussions or negotiations with other parties regarding a potential acquisition of GPC (the "No Shop Provisions").

41.     The Term Sheet allowed WiLAN to undertake extensive due diligence of GPC, the scope of which WiLAN was free to determine "in its sole discretion," as is customary in such transactions.

42.     At the time the parties executed the Term Sheet, WiLAN knew or should have known that, as a result of certain facts and circumstances that it deliberately concealed from GPC (the "Concealed Facts"), the proposed transaction was a virtual impossibility.

43.     WiLAN intentionally withheld the Concealed Facts from GPC and instead acted at all times as if it were genuinely pursuing an acquisition of GPC, in order to induce GPC to enter the several agreements, including the Confidentiality Agreement, the WiLAN NDA, and the Term Sheet, and thereafter disclose to WiLAN the highly-confidential GPC Trade Secrets.

44.     After the parties executed the Term Sheet, WiLAN conducted extensive due diligence of GPC's business and the GPC Trade Secrets.  Among other things, WiLAN accessed a broad range of confidential documents relating to GPC's subsidiary patent holding companies, patent monetization strategies, litigation strategies, marketing strategies, operations and financials.  GPC also provided WiLAN representatives with unlimited access to (i) its employees (who were extensively interviewed by WiLAN representatives), (ii) confidential files, and (iii) GPC's server containing all of GPC's confidential electronic documents and emails.

**WiLAN's Fraudulent Scheme is Revealed and**
**WiLAN Cancels the Acquisition at the Last Minute**

45.     In early June 2010, GPC began to suspect that WiLAN did not intend to follow through with the Acquisition.  Among other things, WiLAN failed to engage outside mergers and acquisition counsel, as is universally customary in such transactions.  Although WiLAN identified to GPC a law firm that it purportedly intended to use, all of the legal work pertaining to the transaction, including drafting and negotiation the acquisition agreement, was performed by WiLAN's Corporate Secretary and Assistant General Counsel, Prashant Watchmaker, Esq.

46.     On or about June 10, 2011, GPC learned some of the Concealed Facts.

47.     On or about June 12, 2011, GPC confronted WiLAN with the Concealed Facts.  Soon thereafter, on or about June 16, 2011—just 13 days prior to the scheduled closing—WiLAN informed GPC that it would not be proceeding with the acquisition.

48.    GPC incurred substantial expenses in reasonable reliance on WiLAN's assurances that it intended to acquire GPC and its ultimate refusal to follow through with said acquisition. These damages included, among other things, legal fees, accounting fees, investment banking fees, and virtual document storage fees.

49.    GPC suffered substantial damages as a result of the No Shop Provisions' limitations on its ability to pursue other suitors.

**Lerner Leaves GPC and Promptly Begins Work at WiLAN**

50.    On or about August 11, 2011 Lerner gave notice to GPC of his resignation from his position at GPC.

51.    Lerner represented to Poltorak and other employees of GPC that he would be leaving for retirement.  He explained that he was tired of his long commute and wanted to spend more time sailing.

52.    Upon information and belief, Lerner's representations were false.  While Lerner purported to be retiring, he was in fact either negotiating employment with WiLAN at this point or had already accepted an offer of employment with WiLAN.

53.    This is shown by, among other things, Lerner's conduct on June 17, 2011—the day immediately following WiLAN's cancellation of the GPC acquisition.  On that day, Poltorak walked into Lerner's office and discovered Lerner on the phone with Cory Houston ("Houston"), Vice President of WiLAN.  Houston had headed WiLAN's acquisition team.  Poltorak questioned Lerner as to why he was conversing with Houston after WiLAN cancelled the transaction.  Lerner explained that Houston had sent him a message through the LinkedIn social network, requesting to add Lerner to his professional network on said social network.  Lerner further explained that he had accepted Houston's invitation and was calling Houston to thank him for the invitation.

12

54.     Lerner failed to disclose his ongoing employment discussion with WiLAN in violation of his fiduciary duties to GPC as well as legal ethics rules governing conflicts of interest.  Significantly, during this time, GPC was considering litigation against WiLAN for WiLAN's bad faith negotiations and fraud.  While Lerner participated in such discussions, he failed to disclose that his assessment of any potential litigation against WiLAN was tainted by his own interests in becoming employed at WiLAN.

55.     Rule 1.7 of the New York Rules of Professional Conduct prohibits a lawyer from representing a client if "there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests."  Upon information and belief, Lerner violated this rule by representing GPC against WiLAN at a time when he was pursuing employment opportunities with WiLAN.

56.     Lerner also violated his fiduciary duties when negotiating his own final separation agreement with GPC, on or about August 11, 2011 ("Separation Agreement").  Lerner failed to advise GPC to retain unconflicted counsel in connection with the Separation Agreement, and GPC was not represented by other counsel in connection therewith.  Without disclosing his intention to work for a competitor and while representing to GPC that he was simply retiring, Lerner deceitfully inserted certain language into the Separation Agreement to give the false impression that he had been terminated more than one year earlier.  Upon information and belief, he inserted this language in a futile attempt to evade the lawful and enforceable one-year non-competition clause contained in the Lerner Non-Compete.  Lerner's insertion of this language into the Separation Agreement was intended to benefit Lerner and WiLAN at GPC's expense and was thus a breach of Lerner's professional and fiduciary obligations.

57.     On or about September 12, 2011 WiLAN issued a press release stating that Lerner had joined WiLAN's senior management team in the position of Senior Legal Counsel and that Lerner would be establishing a WiLAN office in Stamford, Connecticut.  WiLAN's press release also stated that "[i]n particular, [Lerner's] expertise will support the growth of WiLAN's partnership licensing business, that is championed by its subsidiary, Gladios," which directly competes with GPC.

58.     The Lerner Non-Compete was provided to WiLAN during the course of its due diligence.

**FIRST CAUSE OF ACTION**
**(Breach of Contract – Against Lerner)**

59.     GPC repeats and realleges the allegations contained in paragraphs 1 through 58 above, as if fully set forth herein.

60.     The Lerner Non-Compete prohibits Lerner from, among other things:  (i) working with a competitor of GPC for a period of one year following the termination of his employment with GPC; and (ii) using, disseminating, or disclosing to any person, firm or other business entity for any purpose whatsoever, either directly or indirectly, any of GPC's "Confidential Information."

61.     The Lerner Non-Compete is reasonable in time and is necessary to protect GPC's legitimate interests, not harmful to the public, and not unreasonably burdensome to Lerner.

62.     The Lerner Non-Compete further narrows its scope by stating: "Nothing in this agreement, however, shall in any way bar employee from employment by a law firm, including [Lerner's] own law firm, or from carrying on the normal functions, duties and practices of a patent attorney."

63.    By commencing employment with WiLAN, Lerner has breached, and/or is about to breach, the foregoing obligations.

64.    Lerner's conduct has caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

65.    Lerner expressly agreed to the issuance of an injunction to enforce his obligations in the Lerner Non-Compete.  Lerner further agreed that the issuance of an injunction "shall be in addition to all other remedies available to [GPC] in law or in equity including but not limited to [GPC]'s right to recover from [Lerner] any and all damages that may be sustained as a result [Lerner]'s breach.  Lerner further agreed that "[a]ll rights and obligations of the parties pursuant [the Lerner Non-Compete] shall survive any termination" of Lerner's employment with GPC.

66.    Accordingly, GPC is entitled to a preliminary and permanent injunction barring Lerner from working for WiLAN in violation of the Lerner Non-Compete, and is additionally entitled to compensatory damages for any breaches by Lerner in his contractual obligations, in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### (Breach of Contract – Against WiLAN)

67.    GPC repeats and realleges the allegations contained in paragraphs 1 through 66 above, as if fully set forth herein.

68.    The Confidentiality Agreement prohibits WiLAN, with certain limited exceptions, from "solicit[ing] for employment any [GPC] employees to whom [WiLAN was] introduced or

with whom [WiLAN] otherwise had contact as a result of [its] consideration of a Transaction for a period of two years after the date of [the Houlihan Confidentiality Agreement]."

69.     Upon information and belief, WiLAN solicited Lerner for employment, in violation of the Confidentiality Agreement.

70.     The foregoing has caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

71.     Accordingly, GPC is entitled to a preliminary and permanent injunction barring WiLAN from employing Lerner in violation of the Confidentiality Agreement, and is additionally entitled to compensatory damages for any breaches by WiLAN in its contractual obligations, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Breach of Contract to Negotiate In Good Faith – Against WiLAN)

72.     GPC repeats and realleges the allegations contained in paragraphs 1 through 71 above, as if fully set forth herein.

73.     In the Term Sheet, WiLAN agreed that "[t]he parties and GPC shall use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement relating to the Proposed Acquisition (the 'Definitive Agreement') to be executed on the Closing Date."

74.     WiLAN failed to use good faith efforts to negotiate the terms of a definite acquisition agreement, in violation of the Term Sheet.

75.     GPC was damaged thereby.

76.     As a consequence of the foregoing, GPC is entitled to compensatory and exemplary damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Fraud – Against WiLAN)

77.     GPC repeats and realleges the allegations contained in paragraphs 1 through 76 above, as if fully set forth herein.

78.      On or about April 8, 2011, WiLAN tendered an offer to acquire 100% of GPC. WiLAN's offer was memorialized in the Term Sheet dated April 29, 2011.

79.     In the Term Sheet, WiLAN represented that, subject to its satisfactory due diligence and board approval "the Parties expect that the Proposed Acquisition will be consummated on or about May 27, 2011 or such other date to which the Parties may agree."

80.     WiLAN further represented in the Term Sheet that "[t]he parties shall use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement relating to the Proposed Acquisition."

81.     At the time WiLAN made these representations, said representations were false and WiLAN knew them to be false.  Among other things, at the time WiLAN made these representations, it knew of the Concealed Facts, which prevented it from acquiring GPC.

82.     WiLAN made said representations with the intent to induce GPC to, among other things:  (i) cease all negotiations with other potential purchasers of GPC; and (ii) provide WiLAN broad access to the GPC Trade Secrets.

83.     At the time WiLAN made these representations, GPC was ignorant of their falsity and could not, in the exercise of reasonable diligence, have discovered such falsity.

84.     In reliance on the above representations by WiLAN, GPC agreed in the Term Sheet to:  (i) cease all negotiations with other potential purchasers of GPC; and (ii) provide WiLAN broad access to the GPC Trade Secrets.

85.     Had GPC known that WiLAN's representations were false, it would not have ceased all negotiations with other potential purchasers of GPC and would not have provided WiLAN with broad access to the GPC Trade Secrets.

86.     As a consequence of the foregoing, GPC is entitled to compensatory and exemplary damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing – Against WiLAN)

87.     GPC repeats and realleges the allegations contained in paragraphs 1 through 86 above, as if fully set forth herein.

88.     Under New York law, an implied covenant of good faith and fair dealing between GPC and WiLAN arose in connection with the various written contracts between them, including the Confidentiality Agreement, the WiLAN NDA, and the Term Sheet.

89.     WiLAN's failure to disclose the Concealed Facts to GPC during the course of said contractual relationship, or inform GPC of the fact that the Concealed Facts would prevent WiLAN from completing the contemplated acquisition constituted a breach of WiLAN's covenant of good faith and fair dealing.

90.     WiLAN's employment of Lerner constituted a breach of WiLAN's covenant of good faith and fair dealing.

91.     WiLAN's failure to negotiate in good faith constituted a breach of WiLAN's covenant of good faith and fair dealing.

92.     As a consequence of the foregoing, GPC is entitled to compensatory damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Contract – Against WiLAN and Gladios)

93.     GPC repeats and realleges the allegations contained in paragraphs 1 through 92 above, as if fully set forth herein.

94.     The Lerner Non-Compete is a valid, binding agreement between GPC and Lerner.

95.     WiLAN and Gladios are aware of the confidentiality and non-competition provisions of the Lerner Non-Compete.

96.     With full and complete knowledge of the confidentiality and non-competition provisions of the Lerner Non-Compete, WiLAN and/or Gladios have induced Lerner to breach such provisions.

97.     WiLAN and/or Gladios are employing Lerner in violation of the Lerner Non-Compete.

98.     No reasonable justification or excuse exists for Lerner's breach of the Lerner Non-Compete.

99.     GPC has sustained damages as a result of Lerner's breach of the Lerner Non-Compete.

100.    As a consequence of the foregoing, GPC is entitled to compensatory and exemplary damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty– Against Lerner)

101.    GPC repeats and realleges the allegations contained in paragraphs 1 through 100 above, as if fully set forth herein.

102.    As an employee of GPC, Lerner owed GPC various fiduciary duties, including the duties of loyalty, candor, disclosure, and diligence.

103.    As GPC's attorney, Lerner owed GPC various fiduciary duties, including the duties of competence, diligence, communication, confidentiality, loyalty, zealousness, and unconflicted representation.

104.    Among other things, Rule 1.7 of the New York Rules of Professional Conduct prohibits a lawyer from representing a client if "there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." Additionally, Rule 1.8 of the New York Rules of Professional Conduct prohibits a lawyer from using "information relating to representation of a client to the disadvantage of the client."

105.    Upon information and belief, Lerner violated his fiduciary duties to GPC by, among other things: (i) continuing to act as GPC's employee and attorney while he was negotiating with WiLAN for employment; (ii) failing to inform GPC that he was negotiating with WiLAN for employment; (iii) failing to disclose his conflict of interest when analyzing GPC's claims against WiLAN; (iv) failing to carry out his client's instructions to take legal action against WiLAN; (v) misappropriating confidential information of GPC for his own benefit and the benefit of WiLAN; and (vi) accepting employment at WiLAN.

106.    As a consequence of the foregoing, GPC is entitled to disgorgement of any salary, benefits, and bonuses paid by GPC to Lerner from the date of his first disloyal act, along with compensatory and exemplary damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty – Against WiLAN and Gladios)

107.    GPC repeats and realleges the allegations contained in paragraphs 1 through 106 above, as if fully set forth herein.

108.    As an employee and attorney of GPC, Lerner owed GPC various fiduciary duties.

109.    WiLAN and/or Gladios intentionally aided and abetted Lerner in his breach of his fiduciary duties to GPC.

110.    As a consequence of the foregoing, GPC is entitled to compensatory and exemplary damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets – Against all Defendants)

111.    GPC repeats and realleges the allegations contained in paragraphs 1 through 110 above, as if fully set forth herein.

112.    The GPC Trade Secrets constitute valid, legally protectable trade secrets.

113.    The GPC Trade Secrets are highly valuable and are critical to GPC's competitiveness in the marketplace.

114.    WiLAN and/or Gladios misappropriated the GPC Trade Secrets by obtaining them under false pretenses.

115.    Lerner is in possession of the GPC Trade Secrets, subject to contractual and fiduciary confidentiality obligations and/or attorney-client privilege.

116.    Upon information and belief, Lerner has misused the GPC Trade Secrets in connection with his employment by WiLAN.

117.    Lerner will inevitably disclose and/or misuse them in connection with his employment by WiLAN, unless such employment is enjoined.

118.   Upon information and belief, WiLAN and/or Gladios have already used and/or intend to use the GPC Trade Secrets to their benefit.

119.   Accordingly, GPC is entitled to a preliminary and permanent injunction (i) barring Lerner from working with WiLAN, Gladios, and any entity engaged in enforcing the intellectual property rights of others on a contingency fee basis; (ii) barring WiLAN and Gladios from employing or working with Lerner; and (iii) barring Lerner, WiLAN and Gladios from using or disclosing GPC's trade secrets and confidential information, and is additionally entitled to compensatory and exemplary damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Unfair Competition – Against WiLAN and Gladios)

120.   GPC repeats and realleges the allegations contained in paragraphs 1 through 119 above, as if fully set forth herein.

121.   Upon information and belief, WiLAN and Gladios knowingly engaged in a conspiracy to obtain trade secrets and/or confidential information from GPC.

122.   WiLAN and Gladios unlawfully obtained trade secrets and/or confidential information from GPC.

123.   GPC's trade secrets and confidential information include information about GPC's clients that is not readily ascertainable.

124.   By virtue of the foregoing conduct, WiLAN and Gladios have engaged in unfair competition against GPC and continue to unfairly compete against GPC.  WiLAN and Gladios's acts of unfair competition include, among other things:  (i) WiLAN and Gladios's misappropriation of GPC's trade secrets and confidential information; (ii) WiLAN's fraudulent misrepresentations in connection with its purported intent to purchase GPC; and (iii) WiLAN and Gladios's wrongful interference with Lerner's contractual relationship with GPC.

22

125.    WiLAN and Gladios's conduct has proximately caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

126.    Accordingly, GPC is entitled to a temporary restraining order and a preliminary and permanent injunction barring WiLAN and Gladios from using or disclosing GPC's trade secrets and confidential information, and is additionally entitled to compensatory and exemplary damages in an amount to be determined at trial.

**WHEREFORE**, GPC respectfully demands judgment in its favor and against Defendants, for:

a.    a preliminary and permanent injunction:

    i.    barring Lerner from working with WiLAN, Gladios, and any entity engaged in enforcing the intellectual property rights of others on a contingency fee basis;

    ii.    barring WiLAN and Gladios from employing or working with Lerner; and

    iii.    barring Lerner, WiLAN and Gladios from using or disclosing GPC's trade secrets and confidential information;

b.    compensatory and consequential damages in an amount to be determined at trial, such amount to be trebled;

c.    exemplary damages in an amount to be determined at trial;

d.      GPC's allowable attorneys' fees, costs, and disbursements herein; and

e.      such other and further relief as the Court may deem just and proper.


Dated:      New York, New York
            September 21, 2011

                                    Respectfully submitted,

                                    **SILVER & SILVER APC**


                                    By: _____/s Levi Y. Silver_____
                                        Levi Y. Silver (LS6546)
                                        lsilver@silverlawfirm.com

                                        – and –

                                    **POLTORAK PC**
                                    Elie C. Poltorak (EP0770)
                                    elie@poltoraklaw.com

                                    *Attorneys for Plaintiff*