**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
---------------------------------- X
GENERAL PATENT CORPORATION,       :
                                  :
             Plaintiff,           :
                                  :          No. 11 Civ. 6585 (JFK)
     -against-                    :
                                  :          **OPINION & ORDER**
WI-LAN INC., GLADIOS IP INC., and :
PAUL J. LERNER, ESQ.,             :
                                  :
             Defendants.          :
---------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Nov. 22, 2011

APPEARANCES

    FOR PLAINTIFF GENERAL PATENT CORPORATION:
    Levi Y. Silver
    Silver & Silver APC

    FOR DEFENDANTS WI-LAN INC, GLADIOS IP INC.:
    Jamie M. Brickell
    Pryor Cashman

    FOR DEFENDANT PAUL J. LERNER, ESQ.:
    Robert W. Forman
    Shapiro Forman Allen & Sava LLP

**John F. Keenan, United States District Judge:**

    Before the Court is Plaintiff General Patent Corporation's (GPC) application for a preliminary injunction against Wi-Lan, Inc. ("Wi-Lan"), Gladios IP, Inc. ("Gladios"), and Paul J. Lerner, Esq. ("Lerner" and collectively, "Defendants"). The Court held an evidentiary hearing from November 8-10, 2011. On November 14, 2011, the Court vacated the Temporary Restraining Order and denied Plaintiff's application for a preliminary injunction, for the reasons stated below.

**I. Background**

**A. The Parties**

The following allegations are drawn from the Plaintiff's Complaint, unless otherwise noted.[1]  GPC is a patent licensing and enforcement firm headquartered in New York.  It partners with inventors, universities, and small patent owners to license and enforce patents.  In addition, GPC manages and finances patent licensing campaigns in return for a share of the licensing revenues or an ownership interest in the patents.  According to GPC, this business model differs from that of many other patent enforcement companies:  while other patent enforcement companies purchase patents from patent holders, GPC partners with patent holders.  Further, GPC's Chief Executive Officer Alexander Poltorak ("Poltorak"), states that GPC holds "carefully honed and confidential business strategies" that are vigorously safeguarded.  To that end, GPC requires its employees to execute confidentiality and non-compete agreements.  (Poltorak Decl. ¶ 18).

Wi-Lan is a publicly traded Canadian corporation that develops, protects, and licenses patents through the acquisition

---

[1] As of the filing of this Opinion, only the first day's Hearing transcript is available.  Because of the time-sensitive nature of this action, however, I write this Opinion and Order based upon the parties' briefs and exhibits, as well as my recollection of the testimony from the second and third days.  To the extent any facts must be clarified or corrected when the full transcript is made available, I will file a supplemental opinion.

of those patents.  Gladios was formed in November 2010 as a subsidiary of Wi-Lan.  Its business approach is similar to that of GPC, in that Gladios protects patents by partnering with patent owners, instead of acquiring the patents.

Lerner joined GPC in 1999 as General Counsel and has also served as Senior Vice President.  From 2000, Lerner was a member of the GPC Board of Directors and Executive Committee.  In 2004, Lerner signed a non-competition agreement with GPC, which stipulated that he would be precluded from working for any of GPC's competitors for one year after the termination of his employment, should Lerner be terminated for cause. (Forman Aff. Exh. 5).  In February 2010, Poltorak and Lerner discussed his departure from GPC; nevertheless, Lerner continued to work at GPC through August 31, 2011.  After leaving GPC, he joined Wi-Lan, announced in a press release issued by Wi-Lan on September 11, 2011.

### B. Negotiations Between GPC and Wi-Lan

In April 2010, GPC retained investment banking firm Houlihan Lokey Capital, Inc. ("Houlihan") to seek strategic partners to invest in or acquire GPC.  Houlihan approached Wi-Lan, among other firms, about this potential acquisition.  Wi-Lan expressed interest in the investment, noting that GPC's unique business model would help the newly created Gladios excel in the industry.

In the subsequent months, Wi-Lan evaluated the possible acquisition of GPC, and GPC furnished detailed information about its business model.  GPC and Wi-Lan executed a Confidentiality and Non-Solicitation Agreement on November 16, 2010.  The Agreement provided that (1) the information Wi-Lan obtained from GPC would be used only to evaluate the proposed transaction, and (2) Wi-Lan would not solicit GPC's employees for a two-year period from the date of the agreement. (Silver Decl. Exh. J).

On April 8, 2011, Wi-Lan made an offer to acquire GPC.  A non-binding Term Sheet, executed on April 29, 2011, permitted Wi-Lan access to more of GPC's records so that Wi-Lan could conduct due diligence. (Poltorak Decl. ¶ 42).  Wi-Lan executives spent three days in GPC's offices, evaluating records and earnings forecasts.

On June 16, 2011, one week prior to the scheduled closing, Wi-Lan informed GPC that it would not be proceeding with the acquisition.  The proposed transaction was officially cancelled on June 19, 2011. (Id. ¶¶ 46-50).

### C. Lerner's Employment and Termination

Before Lerner's final departure from GPC on August 31, 2011, Poltorak and Lerner drafted a Separation Agreement.  During the drafting process, Lerner emailed Poltorak a series of recitals, which included that his "employment with GPC was terminated on March 2, 2010" and that "it is agreed that

4

Lerner's termination was for the convenience of GPC and without cause." (Silver Decl. Exh. N). In response to these recitals, Poltorak wrote in an email to Lerner that the statements "captured the essence of it all." (Forman Decl. Exh. 10). The final Separation Agreement signed by both parties includes these terms. (Id. Exh. 11).

In June, Lerner began discussing possible employment with Wi-Lan. Cory Houston, an executive at Wi-Lan, allegedly spoke to Lerner on the phone and contacted him through the LinkedIn professional network. (Silver Decl. Exh. L). Wi-Lan published an employment opportunity announcement in the Internet newsletter IPLaw360, to which Lerner responded on June 28, 2011, about twelve days after the GPC-Wi-Lan transaction was cancelled. (Lerner Decl. ¶¶ 25-27). Lerner states that prior to joining Wi-Lan, he provided a copy of his Separation Agreement with GPC, which demonstrated that he was no longer bound by the non-compete.

### D. Instant Action

On September 21, 2011, Judge Buchwald issued a temporary restraining order against (1) Lerner from working with Wi-Lan/Gladios on business development; (2) Wi-Lan from working with Lerner, except on patents that were in its portfolio before Lerner joined the company; (3) Gladios from working with Lerner; and (4) Defendants from using or disclosing GPC's trade secrets

and confidential information.  Following an expedited Discovery, the Court held a Hearing on GPC's application for a preliminary injunction.

## II. Discussion

### A. Legal Standard

Preliminary injunctive relief is "one of the most drastic tools in the arsenal of judicial remedies." Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985).  Because it is such an extraordinary remedy, it should be granted only "when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999).  Upon demonstration that legal remedies are inadequate to make a party whole, a movant may obtain injunctive relief upon the showing of:  "(1) irreparable harm or injury, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in favor of the movant." Earth Web, Inv v. Schlack, 71 F. Supp. 2d 299, 308 (S.D.N.Y. 1999).

Courts have long recognized that irreparable harm is an absolute prerequisite to a preliminary injunction. Demonstrating a mere possibility of harm is not sufficient to warrant the drastic imposition of a preliminary injunction.

Rather, the movant must present sufficient proof to provide a reasonable basis for believing that the injury is real and imminent. See Time Warner Cable, Inc. v. DirecTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).

### B. Injunction Against Lerner

Lerner was undoubtedly an employee of GPC from February 2010 through August 2011. His dubious assertion that he worked in a "consulting" capacity is belied by the fact that he continued to report to the same office, receive tax forms, and enjoy the same benefits as he did before his purported "termination." At his own "farewell" party in August 2011, he stood silently by while Poltorak told colleagues Lerner was entering retirement.

Lerner's disloyal – and perhaps deceitful – behavior notwithstanding, the August 2011 Separation stipulated that Lerner was terminated for "convenience," not for cause. As such, the non-competition period was not triggered. Therefore, GPC cannot succeed in demonstrating that by starting to work for Wi-Lan, Lerner violated the non-compete. Orbit One Commc'ns, Inc. v. Numerex Corp., 692 F. Supp. 2d 373, 376-79 (S.D.N.Y. 2010) (finding that a non-competition covenant, which was dependent upon an employee being terminated for cause, was not triggered where the employer and employee agreed that the employee's departure was not for cause).

GPC has not met its burden for establishing that it is entitled to a preliminary injunction against Lerner on the basis of the non-compete, as it has presented no evidence that the non-compete period was triggered.  Therefore, GPC has shown neither that it has a likelihood of success on the merits of its claim against Lerner, nor that there are sufficiently serious questions going to the merits as to make them a fair ground for litigation.  Moreover, GPC has not presented evidence that it will be irreparably harmed by Lerner's employment at Wi-Lan. See Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 119 (2d Cir. 2009) (holding that a party seeking an injunction must provide "evidentiary support" that a former employee's presence at a competing firm causes ongoing damage to its operations, reputation, or goodwill).

### C. Injunction Against Wi-Lan

GPC has asserted two causes of action against Wi-Lan: misappropriation of trade secrets and violation of the non-solicitation agreement.  First, GPC has not demonstrated that it will be successful on the merits in its misappropriation claim.  Next, although GPC has demonstrated that it is likely to prove that Wi-Lan breached the non-solicitation agreement, it has not satisfied the irreparable harm requirement.  Therefore, a preliminary injunction is inappropriate.

To prevail in a claim for misappropriation of trade secrets, a party must demonstrate "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." R.F.M.A.S., Inc. v. Mimi So, 619 F. Supp. 2d 39, 86 (S.D.N.Y. 2009).  While it is undisputed that the parties were bound by a confidentiality agreement, GPC has not adduced sufficient evidence that its business model comprised trade secrets.

Factors for determining whether business information constitutes a trade secret include:  (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299 (S.D.N.Y. 1999).

GPC has not submitted evidence to demonstrate that its business model satisfies any of the six above-listed elements. In his affidavit, Poltorak detailed eighteen "business strategies," including unique marketing campaigns, a

9

confidential business model, longstanding relationships in the patent community, compensation plans, and unique litigation strategies. (Poltorak Aff. ¶ 16).  Poltorak submits that these eighteen points, taken together, are trade secrets that have allowed GPC to outdo its competitors despite having fewer employees and fewer resources. (Hearing Tr. at 20-21).  At the hearing, however, Poltorak conceded that many of these strategies are not novel; indeed, the strategies are widely known in both the patent protection and marketing communities. (Id. at 17 ("In and of itself, advertising and public relations is not a trade secret.")). See In re Parmalat Sec. Litig., 258 F.R.D. 236, 255 (S.D.N.Y. 2009) (holding that marketing strategies are not trade secrets where the plaintiff "failed to explain what particular information about the particular . . . marketing techniques are not already public [and] are not already commonly known in the industry"), Marietta Corp. v. Fairhurst, 754 N.Y.S.2d 62, 67  (N.Y. App. Div. 2003) (concluding that "pricing data and market strategies . . . would not constitute trade secrets"); see also Silipos, Inc. v. Bickel, No. 06 Civ. 2205, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) ("[T]rade-secret protection does not extend to information regarding market strategies." (internal quotation marks omitted)).

Addressing each of Poltorak's eighteen "confidential business strategies" (Poltorak Decl. ¶ 16) in turn, none of them rise to the level of trade secrets. The first two points in Paragraph 16 of Poltorak's Declaration constitute traditional marketing strategies known by many in the industry, as Poltorak conceded at the Hearing. (Hearing Tr. at 17). The third, fourth, fifth, seventh, eleventh, and fourteenth points describe GPC's relationships with third parties such as patent lawyers, lenders, and other patent professionals. These business contacts are not trade secrets; any patent enforcement firm may meet with someone in the patent enforcement community and forge a unique relationship, which Poltorak also admitted. (Id. at 116-17). See EarthWeb, 71 F. Supp. 2d at 316 (noting that the existence of licensing agreements and lists of contacts are generally not protected as trade secrets). Moreover, Poltorak stated that GPC did not keep detailed lists of these contacts such that protected information would even be available. (Hearing Tr. at 115-16). The sixth point deals with GPC's "triage" system for selecting and analyzing clients, which Poltorak submits is unique in the industry. (Id. at 24-25). GPC has not shown, however, that the system is either secret or valuable to GPC. Rather, Poltorak noted that GPC's method of client intake differs from that of other firms merely because GPC carries out its evaluation in the "opposite order." (Id. at

11

25).  The practice of undertaking the same general methods in a different order is not a trade secret. See Editions Play Bac, S.A. v. W. Pub Co., Inc., No. 92 Civ. 3652, 1993 WL 541219 at *5 (S.D.N.Y. Dec. 28, 1993) ("[M]ethods which are generally known in the industry . . . cannot be trade secrets.").  The eighth point states that GPC's business model is geared toward various sorts of patent holders, yet the fact that GPC works with these patent holders does not preclude other patent enforcement firms from making their own contacts. See Synergy Advanced Pharms., Inc. v. CapeBio, No. 10 Civ. 1736, 2010 WL 2194809 at *5 (S.D.N.Y. June 1, 2010) (stating that the term "trade secrets" is "a term of art which does not cover all confidential information").  Point nine addresses relationships with law firms, which Poltorak admitted are not unique. (Hearing Tr. at 117).  Points sixteen and seventeen address licensing terms and negotiation strategies, yet GPC adduced no evidence that these strategies are novel, secret, or cannot be duplicated.  Point eighteen is a catch-all and therefore need not be addressed.

   Points ten, twelve, and thirteen address GPC's business plans, which GPC has publicized.  Poltorak, a self-proclaimed "thought leader," has published articles detailing the successes of GPC and touting its business model. (Id. at 114 (indicating that he and others in the patent protection community attend conferences and discuss their strategies)).  For instance, point

thirteen, "elaborate and confidential litigation risk management techniques, such as proprietary decision tree analysis templates" appears in an October 2005 article in Law Journal Newsletter, under the heading "Litigation Risk Analysis." (Brickell Aff. Exhs. 6-8). Because Poltorak and GPC have not exhibited an intent to this information secret, it does not warrant trade secret protection. See WGJ Holdings, Inc. v. Greenberg, No. 07 Civ. 2742, 2008 WL 80932 at *4 (S.D.N.Y. Jan. 8, 2008) (holding that Defendant cannot obtain trade secret protection for its recipes because they were published in The New York Times).

Point fifteen addresses a "proprietary set of documents," of which only two were identified at the Hearing: Poltorak's marketing plan (Exh. 24) and the GPC "checklist" (Exh. 100). These documents were not made available to Wi-Lan. (Hearing Tr. at 107-08). The marketing plan was not located on the company's server (Id. at 107-08), and Gladios President Steven Adam testified that GPC never furnished its "checklist" to Wi-Lan. Earthweb, Inc. v. Schlack, No. 99 Civ. 9302, 2000 WL 1093320, at *2, (2d Cir. May 18, 2000) (finding plaintiff's showing insufficient to warrant a preliminary injunction where it failed to demonstrate that defendant had removed proprietary documents or information or was about to violate his duties under the

13

agreement). As a result, even if these items constitute trade secrets, they have not been compromised.

GPC has also argued that during the acquisition talks, Wi-Lan acknowledged that GPC held trade secrets through various email statements exchanged between the companies during due diligence. GPC points to Wi-Lan executives' email statement that they wanted "to get a peek under the covers of a competitor's business structure." (Levi Reply Aff. Exh. AA). However, this evidence does not tend to show that Wi-Lan believed GPC's business plan involved trade secrets. Rather, it indicates nothing more than that Wi-Lan was planning to conduct ordinary due diligence.

GPC has not presented sufficient evidence to demonstrate the existence of trade secrets and therefore has not established: a) a likelihood of success on the merits of its claim against Wi-Lan for misappropriation of trade secrets, or b) serious questions as to the merits of its claim. As a result, it has not satisfied its burden for a preliminary injunction. In addition, even if GPC had raised serious questions as to the merits of its case, its motion for a preliminary injunction fails because it has not proffered evidence that its business will be irreparably harmed.

Next, the Court will address the non-solicitation agreement. GPC and Wi-Lan agreed to the following non-solicitation covenant:

> [N]ot to solicit for employment any GPC employees to whom [Wi-Lan] may be introduced or with whom [Wi-Lan] otherwise has contact as a result of [Wi-Lan's] consideration of a Transaction for a period of two years after the date of [the Confidentiality Agreement], provided that [Wi-Lan] shall not be restricted in any general solicitation for employees . . . not specifically directed at any such persons, and provided further that [Wi-Lan] shall not be restricted in hiring any such person who responded to any such general solicitation.

This covenant is reasonable in scope and limited in duration and therefore is prima facie enforceable. See Ticor, 173 F.3d at 70 (2d Cir. 1999).

Less than a week after dissolving the acquisition deal, Wi-Lan began talking to Lerner about employment opportunities. While Lerner contends that he sought employment at Wi-Lan after reading an announcement on IPLaw360, the temporal proximity of Lerner's discussions with Wi-Lan to Wi-Lan's cancellation of the acquisition raises several questions as to the veracity of this assertion. Although not dispositive, it is also noteworthy that

15

executives of Wi-Lan requested to join Lerner's "LinkedIn" network.

Despite the fact that GPC might succeed on the merits of its claim for breach of the nonsolicitation agreement, a preliminary injunction is inappropriate here because it has not been established that GPC will suffer irreparable harm.  While the divulgence of trade secrets might warrant an equitable solution, FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984), GPC has not demonstrated that it possesses trade secrets.

While irreparable harm can be proven even in the absence of trade secrets, GPC has failed to satisfy its burden:  GPC has not suggested that Lerner's employment with Wi-Lan will cause GPC to lose clients or diminish its capacity to implement its patent enforcement strategies.  An employee's mere "knowledge of the intricacies of [a former employer's] business operation" is not a protectable interest sufficient to justify enjoining the employee "from utilizing his knowledge and talents in this area." Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303 (1976); see Tradition Chile Agentes de Valores LTDS v. ICAP Sec. USA LLC, No. 09 Civ. 10343, 2010 WL 185656 at *3 (S.D.N.Y. Jan. 12, 2010) ("A party seeking an injunction must provide evidentiary support of ongoing damage to its operations, reputation or goodwill.")

16

Moreover, GPC has not proffered evidence to demonstrate that Lerner was irreplaceable and, therefore, a unique employee. International Creative Management, Inc. v. Abate, No. 07 Civ. 1979, 2007 WL 950092 at *6 (S.D.N.Y. Mar. 28, 2007) (noting that the standard for uniqueness is "high" and that a unique employee's replacement is "impossible"). GPC's arguments have amounted to mere speculation that Lerner's employment at Wi-Lan will cause irreparable harm. See Tradition Chile, 2010 WL 185656 at *3 ("Mere speculation that the loss of a valuable employee will result in [irreparable harm] is insufficient to warrant an injunction."). Therefore, GPC has not established that it will suffer irreparable harm.

Indeed, GPC will be positioned to pursue remedies at law if it is ultimately determined that Wi-Lan violated the non-solicitation agreement. Any harm that befalls GPC would occur during the two-year non-solicitation period, and would involve only the areas of the business in which GPC was involved, i.e., not the actual enforcement of patents, but rather, the marketing scheme. If it is determined that Lerner held confidential information that he used at Wi-Lan, the amount of money that is owed to GPC would be readily calculable.

## III. Conclusion

For the reasons stated above, the application for a preliminary injunction is denied. A status conference is scheduled for January 10, 2012 at 11:00 a.m.

**SO ORDERED.**

Dated:   New York, New York
         November 22, 2011

                                    _____
                                    John F. Keenan
                                    United States District Judge