ב"ה

Levi Y. Silver (LS6546)
lsilver@silverlawfirm.com
**SILVER & SILVER APC**
245 West 17th Street, 5th Floor
New York, New York 10011
Telephone:  (212) 851-6428
Facsimile:  (619) 231-1616

Elie C. Poltorak (EP0770)
elie@poltoraklaw.com
**POLTORAK PC**
1650 Eastern Parkway, Suite 400
Brooklyn, NY 11233
Telephone: (718) 943-8815
Facsimile: (718) 943-8816

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENERAL PATENT CORPORATION,<br><br>                                  Plaintiff,<br><br>            -against-<br><br>WI-LAN INC., GLADIOS IP INC.,<br>and PAUL J. LERNER, ESQ.<br><br>                                  Defendants. | No. 11 Civ. 6585 (JFK-DCF)<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff General Patent Corporation ("GPC"), by and through its undersigned attorneys,

as and for its First Amended Complaint against Defendants Wi-LAN Inc. ("WiLAN"), Gladios

IP Inc. ("Gladios") and Paul J. Lerner, Esq. ("Lerner") (collectively, "Defendants"), alleges upon

personal information as to itself and its own acts, and upon information and belief as to all other

matters, as follows:

## SUMMARY OF ACTION

1.     This lawsuit arises out of WiLAN and Lerner's fraudulent and unlawful scheme for WiLAN to compete with GPC by misappropriating GPC's highly confidential information, and raiding its second most senior employee, Lerner, in violation of WiLAN and Lerner's contractual and fiduciary obligations to GPC.  As explained below, WiLAN gained access to the confidential and proprietary information that made GPC's business model so successful by purporting to negotiate in good faith to acquire GPC while it fraudulently withheld material information from GPC.  After it had gained virtually unfettered access to GPC's highly confidential information, WiLAN abruptly cancelled its acquisition of GPC and announced that it was opening a new office not far from GPC's headquarters, which would be headed by Lerner and which would compete directly with GPC.

## PARTIES

2.     Plaintiff GPC is a corporation incorporated under the laws of the State of New York and having a principal office at Montebello Park, 75 Montebello Road, Suffern, New York 10901.

3.     Upon information and belief, defendant WiLAN is a corporation incorporated under the laws of Canada, having a principal office at 11 Holland Avenue, Suite 608, Ottawa, Ontario K1Y 4S1, Canada.  According to its 2010 Annual Report and its website, WiLAN is primarily engaged in the business of acquiring and assertively licensing patents.

4.     Upon information and belief, Defendant Gladios is a corporation that is a wholly-owned subsidiary of WiLAN, having a principal office at 1620 Scott Street, Suite 15, Ottawa, Ontario K1Y 4S1, Canada.  According to its website and WiLAN's 2010 Annual Report, Gladios is primarily engaged in the business of partnering with patent owners that wish to monetize their intellectual property by means of patent licensing and enforcement.  Gladios

2

operates on a contingency basis, in which the original patent owners retain ownership of their patents, while Gladios manages and finances the patent licensing and enforcement campaign in return for a share of the revenues.

5.      Upon information and belief, Defendant Lerner is an individual residing at 7 White Birch Road, Madison, Connecticut 06443. Lerner is an attorney admitted to practice in New York. Lerner was employed by GPC since 1999 and, until September 5, 2011, held the title of Director, Senior Vice President and General Counsel. Lerner is also a shareholder in GPC owning 20,000 shares of common stock, which represents approximately 2% of GPC's outstanding shares. Upon information and belief, Lerner became an employee of WiLAN and Gladios on or about September 6, 2011.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1332(a)(3) in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states and in which citizens or subjects of a foreign state are additional parties.

7.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred there. Additionally, Defendants WiLAN and Gladios submitted to this Court's jurisdiction in the several agreements entered between the parties.

## FACTUAL ALLEGATIONS

### GPC's Business and the GPC Trade Secrets

8.      GPC is "a leading patent licensing and enforcement firm"—as acknowledged by WiLAN in a press release issued on or about September 12, 2011. Upon information and belief, GPC was the first such company in the United States and, likely, the world. GPC pioneered its

business model almost 25 years ago and has been the premier player in the patent licensing industry ever since.

9.    GPC's primary business focus is to partner with patent owners in order to license and enforce their patents.  GPC operates on a contingency basis, in which it finances and manages patent licensing and enforcement campaigns against suspected infringers, in return for an ownership interest in the underlying patents entitling it to a share of the proceeds.

10.    GPC maintains its status as a leading patent licensing and enforcement company through an array of carefully honed and confidential business strategies, including, among other things:  (i) a unique and confidential internet-based marketing strategy tailored for a contingency based patent licensing and enforcement business that is responsible for the bulk of GPC's deal-flow and which was developed over many years at great expense and effort; (ii) various secondary online and traditional marketing strategies and techniques tailored for a contingency based patent licensing and enforcement business, including but not limited to various advertising venues, public relations campaigns, direct mailings, trade show participations and/or exhibitions, and viral marketing campaigns; (iii) confidential business development and partnering strategies, including various strategies uniquely geared toward a contingency-based patent licensing and enforcement business; (iv) a network of affiliates that GPC spent many years building, including patent attorneys, patent agents, licensing professionals and other individuals who source and refer prospective clients to GPC; (v) unique compensation arrangements with affiliates; (vi) unique strategies developed over the course of many years for selecting patents GPC accepts for licensing and enforcement from among the hundreds of submissions it reviews each year, and specific criteria for streamlining the patent selection process, including a confidential, detailed procedure that is followed in conducting initial analysis and subsequent in-depth due diligence

4

on patents; (vii) well developed relationships that took years to cultivate with a number of outside vendors that play a crucial role in GPC's success, including reverse-engineering firms, offshore patent investigation firms, and U.S. patent attorneys who assist GPC in assessing the strength of submitted patents; (viii) unique business models geared toward various sorts of patent holders, including individual inventors and other non-practicing entities, practicing entities, and universities; (ix) various crucial relationships necessary for enforcing patents against suspected infringers with little up-front capital investment that were cultivated over the course of many years, including, relationships with prominent law firms that litigate patent infringement cases on a contingency basis, including law firms that do not publicly hold themselves out as willing to handle such cases on a contingency basis; (x) a unique, cost-effective, and confidential contingency formula for compensating outside counsel; (xi) relationships with local counsel in GPC's forums of choice for litigating patent infringement cases; (xii) confidential, proprietary patent litigation strategies developed by GPC based in part on game theory, real options theory, and practical litigation experience; (xiii) elaborate and confidential litigation risk management techniques, such as proprietary decision tree analysis templates; (xiv) long-standing relationships with lenders willing to finance out-of-pocket patent litigation expenses; (xv) a proprietary set of documents governing the unique structure of GPC's relationship with clients, which are unknown to GPC's competitors; (xvi) licensing terms that GPC offers prospective licensees; (xvii) proprietary negotiation strategies; and (xviii) other proprietary know-how (collectively, the "GPC Trade Secrets").

11.     The GPC Trade Secrets were developed by GPC over a long period of time—almost a quarter century—at great expense and effort.  The GPC Trade Secrets are vital to GPC and would be highly valuable to GPC's many competitors, to GPC's detriment.  GPC takes

extensive measures to guard the secrecy of the GPC Trade Secrets, including by entering

confidentiality agreements with any employees or strategic partners that are likely to gain access

to such information.  The GPC Trade Secrets are not generally known outside of GPC and

significant safeguards are in place to prevent the disclosure of the GPC Trade Secrets.  The GPC

Trade Secrets cannot easily be properly acquired or duplicated by others.

**The Non-Compete**

12.     As a result of his position with GPC as Senior Vice President, General Counsel,

and a member of the Board of Directors and the Executive Committee, Lerner was necessarily

privy to all, or virtually all, of the GPC Trade Secrets.

13.     In order to protect GPC from potential disclosure and illicit use of the GPC Trade

Secrets, Lerner and GPC entered into a Confidentiality and Noncompetition Agreement, dated

January 5, 2004 (the "Non-Compete").

14.     The Non-Compete was drafted by Lerner in his capacity as General Counsel of

GPC.

15.     Lerner expressly acknowledged in the Non-Compete that GPC's confidential

information "constitutes valuable intellectual property" of GPC and that Lerner would have

access to such confidential information during the course of his employment with GPC.  Lerner

further acknowledged that GPC would suffer irreparable harm if he breached, or threatened to

breach, the Non-Compete.  Further, Lerner agreed that GPC would "be entitled to seek injunctive

relief, both preliminary and permanent, enjoining and restraining such breach or threatened

breach."

16.     The Non-Compete prohibited Lerner, during and after the term of his

employment, from, directly or indirectly, using, disseminating, or disclosing to any person, firm

or other business entity for any purpose whatsoever any "Confidential Information."  The Non-

Compete defined "Confidential Information" as "information, not known to the general public or in the industry in which [GPC] is engaged, including but not limited to information about [GPC]'s processes, clients, services, methods, suppliers, affiliates, pricing policies and related matters, including trade secrets and know-how," with certain limited exceptions.

17.     The Non-Compete also prevented Lerner from working for any competitor of GPC within the United States for a period of one year following any termination of his employment with GPC, unless his employment was unilaterally terminated by GPC without "Cause."

**WiLAN's Unsuccessful Attempt to Legitimately Enter the Partnership Licensing Business**

18.     The business model of WiLAN differs from that of GPC.  WiLAN **buys** patents for purposes of licensing and enforcement.  GPC, on the other hand, partners with patent owners to monetize their patents on a revenue-sharing basis.  In 2010, WiLAN attempted to enter the **partnership**-based licensing business through its wholly-owned subsidiary, Gladios.

19.     These attempts were largely unsuccessful.  Lacking GPC's trade secrets and know-how, Gladios was unable to either generate a substantial deal-flow or effectively monetize its clients' patents.

20.     On or about March 29, 2011, WiLAN's CEO, James Skippen ("Skippen"), stated to GPC's Chairman and CEO, Alexander Poltorak ("Poltorak"), that Gladios was a failure.

**WiLAN's Fraudulent Scheme to Misappropriate GPC's Trade Secrets**

21.     In or about April 2010, GPC began seeking potential strategic partners to invest in or acquire GPC.

22.     In connection with said search, GPC retained the investment banking firm Houlihan Lokey Capital, Inc., ("Houlihan").

23.     Houlihan sent a one page description of GPC, known as a "teaser," to various entities it believed might be interested in investing in or acquiring GPC.  Any interested party was required to execute a confidentiality agreement, upon which Houlihan would send the interested party a Confidential Information Memorandum ("CIM") providing further information about GPC.

24.     Lerner was listed in the CIM as a Director, Senior Vice President and General Counsel of GPC.  Lerner reviewed and approved several drafts of the CIM, including in or about September, October and November of 2010.

25.     WiLAN was among the parties approached by Houlihan as a prospective investor/acquirer.

26.     On or about November 16, 2010, WiLAN entered into a Confidentiality Agreement with GPC (the "Confidentiality Agreement").

27.     Pursuant to the Confidentiality Agreement, WiLAN was prohibited from:  (i) using the information provided by GPC for any purpose other than evaluating the proposed transaction; or (ii) soliciting GPC's employees for employment for a two year period.

28.     Upon execution of the Confidentiality Agreement, Houlihan furnished the CIM to WiLAN.  The CIM provided an overview of GPC's business, including its history, strategic focus, financial performance, background of key employees, marketing strategies, organizational structure, and patent holdings.  Specifically, the CIM provided a summary of each patent portfolio that was deemed to be valuable by GPC.  These summaries described the patented technology, licensing efforts, and the products that were thought to be infringing on the patents.

29.     In or about January 2011, GPC received preliminary non-binding expressions of interest from several parties, including WiLAN.

30.     On or about February 14, 2011, WiLAN demanded more detailed information on GPC than that provided in the CIM.  Specifically, WiLAN requested more comprehensive confidential and privileged information on the patents in which GPC held an interest.

31.     On or about February 22, 2011, GPC sent to WiLAN a list of its revenue-generating patent portfolios, indicating for each portfolio how much revenue had been derived and whether there remained any potential for further revenue.

32.     On or about February 22, 2011, WiLAN sent representatives to visit GPC for the purported purpose of assessing the desirability of the acquisition.  WiLAN also sent a list of topics on which it wanted more information, which included:  (i) corporate and financial information; (ii) the background of GPC's employees, as well as their compensation, and motivation to remain with the business post-acquisition; (iii) GPC's existing patent portfolios; and (iv) the pipeline of patents being submitted to GPC for consideration by prospective clients.

33.     On or about March 8, 2011, GPC and WiLAN executed a Non-Disclosure and Common Legal Interest Agreement (the "WiLAN NDA").  Pursuant to the terms of the WiLAN NDA, GPC agreed to provide highly-confidential information to WiLAN on the basis that "the Parties intend[ed] to enter into a relationship whereby WiLAN may acquire ownership interests for the purposes of enforcement in some or all of" GPC's patents.

34.     Upon execution of the WiLAN NDA, GPC furnished WiLAN with (i) comprehensive, highly confidential, and privileged information on the patents in which GPC had an interest; and (ii) access to GPC's employees who were knowledgeable regarding such patents and GPC's efforts to license and enforce them.

35.     Thereafter, WiLAN's representatives again visited GPC on or about March 10, 2011, during which visit they heard presentations from GPC's CEO and other employees and

had ample opportunity to ask questions about GPC, its strategy, employees, and patent portfolios.

36.     On or about March 29, 2011 WiLAN's CEO Skippen and WiLAN's CFO, Shaun McEwan, visited GPC's headquarters in Suffern, New York.

37.     On or about April 8, 2011, WiLAN offered to acquire a 100% of GPC.

38.     The parties reached agreement on material terms of the acquisition, which were memorialized in a Confidential Term Sheet, dated April 29, 2011 (the "Term Sheet"), which required the parties to "use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement…."

39.     The Term Sheet also contained a "no shop" provision, which required GPC to cease all discussions or negotiations with other parties regarding a potential acquisition of GPC (the "No Shop Provisions").

40.     The Term Sheet allowed WiLAN to undertake extensive due diligence of GPC, the scope of which WiLAN was free to determine "in its sole discretion," as is customary in such transactions.

41.     At the time the parties executed the Term Sheet, WiLAN knew or should have known of certain facts that materially impacted the contemplated acquisition (the "Concealed Facts").  Specifically, WiLAN knew or should have known, among other things, that it had granted to various companies certain blanket licenses covering all of WiLAN's existing patents, as well as any patents that WiLAN might acquire in the future (the "After-Acquired License Rights").  Additionally, WiLAN knew or should have known that many of GPC's patents would be subject to such After-Acquired License Rights and would, therefore, become worthless instantly upon WiLAN's acquisition of GPC.  Additionally, WiLAN knew or should have known

that GPC could not, consistent with its fiduciary obligations to the patent owners on whose behalf GPC undertook to enforce such patents, take any action that would destroy the value of said patents.

42.     WiLAN intentionally withheld the Concealed Facts from GPC in order to induce GPC to enter several agreements, including the Confidentiality Agreement, the WiLAN NDA, and the Term Sheet, and thereafter disclose to WiLAN the highly-confidential GPC Trade Secrets.

43.     After the parties executed the Term Sheet, WiLAN conducted extensive due diligence of GPC's business and the GPC Trade Secrets.  Among other things, WiLAN accessed a broad range of confidential documents relating to GPC's subsidiary patent holding companies, patent monetization strategies, litigation strategies, marketing strategies, operations, and financials.  GPC also provided WiLAN representatives with unlimited access to (i) its employees (who were extensively interviewed by WiLAN representatives), (ii) confidential files, and (iii) GPC's server containing all of GPC's confidential electronic documents and emails.

**WiLAN's Fraudulent Scheme is Revealed and**
**WiLAN Cancels the Acquisition at the Last Minute**

44.     In early June 2010, GPC began to suspect that WiLAN did not intend to follow through with the Acquisition.  Among other things, WiLAN failed to engage outside mergers and acquisition counsel, as is universally customary in such transactions.  Although WiLAN identified to GPC a law firm that it purportedly intended to use, all of the legal work pertaining to the transaction, including drafting and negotiation the acquisition agreement, was performed by WiLAN's Corporate Secretary and Assistant General Counsel, Prashant Watchmaker, Esq.

45.     On or about June 10, 2011, GPC learned some of the Concealed Facts.

46.     On or about June 12, 2011, GPC confronted WiLAN with GPC's knowledge of the Concealed Facts.  Thereafter, on or about June 19, 2011, WiLAN informed GPC that it certainly would not be proceeding with the acquisition.

47.     GPC incurred substantial expenses in reasonable reliance on WiLAN's assurances that it intended to acquire GPC and WiLAN's ultimate refusal to follow through with said acquisition.  These damages include, among other things, legal fees, accounting fees, investment banking fees, virtual document storage fees, and the diversion and distraction of GPC's employees during the course of the contemplated acquisition.

48.     GPC also suffered substantial damages as a result of the No Shop Provisions' limitations on its ability to pursue other suitors.

**Lerner Contributed to the Acquisition's Failure by Agreeing
to Work for WiLAN even if WiLAN Cancelled The Acquisition**

49.     No later than June 19, 2011, Lerner informed WiLAN that he was prepared to work for WiLAN whether or not the acquisition closed.  Specifically, Lerner informed WiLAN that, should WiLAN cancel the acquisition, Lerner intended to quit his employment with GPC and begin working for WiLAN.

50.     The aforementioned employment discussions between Lerner and WiLAN occurred at a time during which there remained a real possibility that the acquisition would successfully close.

51.     The aforementioned employment discussions between Lerner and WiLAN contributed to the acquisition's failure by incentivizing WiLAN to cancel the deal and still receive Lerner and certain of GPC's valuable intellectual property—assets that it could have otherwise received only in the context of the acquisition.

**For Several Months After WiLAN Cancelled**
**the Acquisition, Lerner Acted as a Double Agent**

52.     WiLAN cancelled the acquisition in late June 2011.

53.     Lerner remained an employee of GPC until early September 2011, when he departed from GPC, purportedly to retire.

54.     During the time period between WiLAN's cancellation of the acquisition and Lerner's departure from GPC, Lerner fraudulently concealed his active efforts to become employed by GPC.  Moreover, during this time period, Lerner acted as a double agent, advancing his own and WiLAN's interests to the disadvantage of GPC, in knowing violation of his ethical and contractual obligations to GPC.

55.     Among other things, during this time period, GPC considered commencing litigation against WiLAN for, among other things, WiLAN's fraudulent conduct in connection with the acquisition.  Lerner advised GPC regarding this contemplated litigation while fraudulently concealing his active efforts to become employed by WiLAN and the grave conflicts of interest engendered thereby.  Additionally, during this time, GPC instructed Lerner to take certain legal action against WiLAN and Lerner failed to do so.

56.     Additionally, during this time, Lerner advised WiLAN on how to compete with GPC and on how to defeat GPC in a potential litigation.  For example, on or about July 18, 2011, Lerner sent to Skippen a letter discussing certain strategies by which WiLAN could replicate GPC's business model.  Additionally, while Lerner knew at this time that GPC was considering litigation against WiLAN, and further understood that Lerner's prospective employment with WiLAN would likely cause GPC to sue WiLAN, Lerner advised Skippen to locate WiLAN's offices outside of New York, because "we are less likely to have an adverse reaction from Alex [Poltorak of GPC] if we are in another state."

13

**Lerner Gave GPC Fraudulent Legal Advice in**
**Connection with His Employee Separation Agreement**

57.     On or about August 9, 2011, Lerner informed GPC that he was resigning from

GPC ***to retire***.  Among other things, Lerner represented to GPC that he was tired of his long

commute and wanted to spend more time sailing and, possibly, helping his wife with her solo

law practice in Connecticut.  Additionally, on or about August 30, 2011, GPC held a retirement

party for Lerner at which Lerner was presented, as a retirement gift, with a large framed

caricature of himself next to his sail boat signed by all employees of GPC.  During all this time,

Lerner fraudulent concealed that he was in fact leaving GPC to work for WiLAN in violation of

the Non-Compete.

58.     On August 10, 2011, Lerner sent to Poltorak an email containing a draft employee

separation agreement (the "Draft Separation Agreement") memorializing certain proposed terms

of Lerner's departure from GPC.  Lerner and GPC ultimately signed a final employee separation

agreement, (the "Separation Agreement") on or about August 11, 2011.

59.     Lerner fraudulently inserted into the Draft Separation Agreement certain proposed

terms with the intention of circumventing his contractual obligation under the Non-Compete.

Moreover, on or about August 10-11, 2011, Lerner gave GPC fraudulent legal advice in

connection such proposed terms.

60.     Among other things, Lerner inserted into the Draft Separation Agreement that

"[i]t is agreed that Lerner's termination was for the convenience of GPC and without cause."

When GPC asked Lerner about the purpose and effect of this proposed term, Lerner fraudulently

advised GPC that this proposed term was relevant only to the question of whether Lerner would

be eligible for unemployment insurance, and that this clause had no other effect.

61.     Lerner's representations to GPC regarding this proposed term were fraudulent.  In fact, Lerner inserted this proposed term into the Draft Separation Agreement because the Non-Compete permits Lerner to work for a GPC competitor in the event he is unilaterally terminated by GPC without cause.  Lerner knew that GPC would never agree to include this proposed term in the final Separation Agreement if it knew that Lerner intended to work for WiLAN and/or that this proposed term might adversely effect the enforceability of the Non-Compete.  Therefore, Lerner fraudulently concealed the true purpose and effect of this proposed term and instead lied to GPC about said purpose and effect.

62.     This proposed term was rejected by GPC and was not included in the final Separation Agreement.

63.     Lerner also inserted into the Draft Separation Agreement a reference to a time that Lerner was temporarily demoted in early 2010.  When GPC inquired of Lerner about this reference, Lerner advised GPC that this reference was designed to protect GPC—for example from severance claims—and that this language had no other purpose or effect.

64.     Lerner's representations about this reference were fraudulent.  In fact, Lerner inserted this reference into the Draft Separation Agreement in order to give the false impression that Lerner had been terminated by GPC in early 2010—more than one year earlier—and thereby circumvent the strictures of the Non-Compete, which prevented Lerner from working for certain competitors of GPC for one year following the termination of his employment.

**Lerner Shared a Copy of the Separation Agreement with WiLAN**
**in Plain Breach of Said Agreement and in Violation of His Duty**
**<u>to Maintain the Confidentiality of  GPC's Confidential Information</u>**

65.     Section 5.A. of the Separation Agreement requires Lerner, with certain exceptions not applicable here, to keep the terms of the Separation Agreement completely confidential.

Lerner knowingly breached this provision, and his ethical and contractual duties to his GPC, by giving to WiLAN a copy of the Separation Agreement.

**WiLAN Announces Its Employment of Lerner**

66.     On or about September 12, 2011, WiLAN issued a press release stating that Lerner had joined WiLAN's senior management team in the position of Senior Legal Counsel and that Lerner would be establishing a WiLAN office in Stamford, Connecticut.  WiLAN's press release also stated that "[i]n particular, [Lerner's] expertise will support the growth of WiLAN's partnership licensing business, that is championed by its subsidiary, Gladios," which competes directly with GPC.

**Lerner Committed Further Legal Malpractice in
Connection with His Negligent Breach of a License Agreement**

67.     On or about July 6, 2011, GPC entered into a "Confidential Settlement and Non-Exclusive Patent License Agreement" (the "License Agreement") with a third party (the "License Agreement Counterparty").

68.     Under the terms of the License Agreement, the License Agreement Counterparty was required to pay GPC certain monies in settlement of certain litigation between GPC and the License Agreement Counterparty.

69.     The License Agreement also contained a confidentiality clause, which provided that "No public statement shall be made regarding this Agreement."

70.     Lerner negotiated the terms of the License Agreement with the License Agreement Counterparty on behalf of GPC, and specifically negotiated the above-referenced confidentiality clause.

71.     Notwithstanding the above-referenced confidentiality clause, Lerner, as GPC's General Counsel, approved for release a press release making certain public statements about the License Agreement.

72.     As a direct result of Lerner's negligence and legal malpractice, and GPC's consequent release of the aforementioned press release, GPC had to enter a subsequent settlement agreement with the License Agreement Counterparty, which reduced the amount to be paid by the License Agreement Counterparty to GPC by $30,000.

**FIRST CAUSE OF ACTION**
**(Breach of Contract – Against Lerner)**

73.     GPC repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

74.     The Non-Compete prohibits Lerner from, among other things:  (i) working with a competitor of GPC for a period of one year following the termination of his employment with GPC; and (ii) using, disseminating, or disclosing to any person, firm or other business entity for any purpose whatsoever, either directly or indirectly, any of GPC's "Confidential Information."

75.     The Non-Compete is reasonable in time and is necessary to protect GPC's legitimate interests, not harmful to the public, and not unreasonably burdensome to Lerner.

76.     The Non-Compete further narrows its scope by stating: "Nothing in this agreement, however, shall in any way bar employee from employment by a law firm, including [Lerner's] own law firm, or from carrying on the normal functions, duties and practices of a patent attorney."

77.     By commencing employment with WiLAN, Lerner has breached, and/or is about to breach, the foregoing obligations.

78.     Lerner's conduct has caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

79.     Lerner expressly agreed to the issuance of an injunction to enforce his obligations in the Non-Compete.  Lerner further agreed that the issuance of an injunction "shall be in addition to all other remedies available to [GPC] in law or in equity including but not limited to [GPC]'s right to recover from [Lerner] any and all damages that may be sustained as a result [Lerner]'s breach.  Lerner further agreed that "[a]ll rights and obligations of the parties pursuant [the Non-Compete] shall survive any termination" of Lerner's employment with GPC.

80.     Accordingly, GPC is entitled to a preliminary and permanent injunction barring Lerner from working for WiLAN in violation of the Non-Compete, and is additionally entitled to compensatory damages for any breaches by Lerner in his contractual obligations, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract – Against WiLAN)

81.     GPC repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

82.     The Confidentiality Agreement contains a non-solicitation clause (the "Non-Solicit"), which prohibits WiLAN, with certain limited exceptions, from "solicit[ing] for employment any [GPC] employees to whom [WiLAN was] introduced or with whom [WiLAN] otherwise had contact as a result of [its] consideration of a Transaction for a period of two years after the date of [the Confidentiality Agreement]."

83.     Upon information and belief, WiLAN solicited Lerner for employment, in violation of the Non-Solicit.

84.     The foregoing has caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

85.     Accordingly, GPC is entitled to a preliminary and permanent injunction barring WiLAN from employing Lerner in violation of the Non-Solicit, and is additionally entitled to compensatory damages for any breaches by WiLAN in its contractual obligations, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Breach of Contract to Negotiate In Good Faith – Against WiLAN)

86.     GPC repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

87.     In the Term Sheet, WiLAN agreed that "[t]he parties and GPC shall use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement relating to the Proposed Acquisition (the 'Definitive Agreement') to be executed on the Closing Date."

88.     WiLAN failed to use good faith efforts to negotiate the terms of a definite acquisition agreement, in violation of the Term Sheet.

89.     GPC was damaged thereby.

90.     As a consequence of the foregoing, GPC is entitled to compensatory and exemplary damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Fraud – Against WiLAN)

91.     GPC repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

92.     On or about April 8, 2011, WiLAN tendered an offer to acquire 100% of GPC. WiLAN's offer was memorialized in the Term Sheet dated April 29, 2011.

93.     In the Term Sheet, WiLAN represented that, subject to its satisfactory due diligence and board approval "the Parties expect that the Proposed Acquisition will be consummated on or about May 27, 2011 or such other date to which the Parties may agree."

94.     WiLAN further represented in the Term Sheet that "[t]he parties shall use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement relating to the Proposed Acquisition."

95.     At the time WiLAN made these representations, said representations were false and WiLAN knew them to be false.  Among other things, at the time WiLAN made these representations, it knew of the Concealed Facts, which materially and adversely affected its ability to acquire GPC.

96.     WiLAN made said representations with the intent to induce GPC to, among other things:  (i) cease all negotiations with other potential purchasers of GPC; and (ii) provide WiLAN broad access to the GPC Trade Secrets.

97.     At the time WiLAN made these representations, GPC was ignorant of their falsity and could not, in the exercise of reasonable diligence, have discovered such falsity.

98.     In reliance on the above representations by WiLAN, GPC agreed in the Term Sheet to:  (i) cease all negotiations with other potential purchasers of GPC; and (ii) provide WiLAN broad access to the GPC Trade Secrets.

99.     Had GPC known that WiLAN's representations were false, it would not have ceased all negotiations with other potential purchasers of GPC and would not have provided WiLAN with broad access to the GPC Trade Secrets.

100.    As a consequence of the foregoing, GPC is entitled to compensatory and exemplary damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing – Against WiLAN)

101.    GPC repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

102.    Under New York law, an implied covenant of good faith and fair dealing between GPC and WiLAN arose in connection with the various written contracts between them, including the Confidentiality Agreement, the WiLAN NDA, and the Term Sheet.

103.    WiLAN's failure to disclose the Concealed Facts to GPC during the course of said contractual relationship, or inform GPC that the Concealed Facts materially and adversely affected the contemplated acquisition constituted a breach of WiLAN's covenant of good faith and fair dealing.

104.    WiLAN's employment of Lerner constituted a breach of WiLAN's covenant of good faith and fair dealing.

105.    WiLAN's failure to negotiate in good faith constituted a breach of WiLAN's covenant of good faith and fair dealing.

106.    As a consequence of the foregoing, GPC is entitled to compensatory damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Contract – Against WiLAN and Gladios)

107.   GPC repeats and realleges the allegations contained in each of the foregoing

paragraphs as if fully set forth herein.

108.   The Non-Compete is a valid, binding agreement between GPC and Lerner.

109.   WiLAN and Gladios are, and at all relevant times were, aware of the

confidentiality and non-competition provisions of the Non-Compete.

110.   With full and complete knowledge of the confidentiality and non-competition

provisions of the Non-Compete, WiLAN and/or Gladios have induced Lerner to breach such

provisions.

111.   WiLAN and/or Gladios are employing Lerner in violation of the Non-Compete.

112.   No reasonable justification or excuse exists for Lerner's breach of the Non-

Compete.

113.   GPC has sustained damages as a result of Lerner's breach of the Non-Compete.

114.   As a consequence of the foregoing, GPC is entitled to compensatory and

exemplary damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Tortious Interference with Contract – Against Lerner)

115.   GPC repeats and realleges the allegations contained in each of the foregoing

paragraphs as if fully set forth herein.

116.   The Non-Solicit is a valid, binding agreement between GPC and WiLAN.

117.   Lerner is, and at all relevant times was, aware of the Non-Solicit.

118.   With full and complete knowledge of Non-Solicit, Lerner has induced WiLAN to

breach the Non-Solicit.

119.   WiLAN and/or Gladios employed Lerner in violation of the Non-Solicit.

22

120.    No reasonable justification or excuse exists for WiLAN's breach of the Non-

Solicit.

121.    GPC has sustained damages as a result of WiLAN's breach of the Non-Solicit.

122.    As a consequence of the foregoing, GPC is entitled to compensatory and

exemplary damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duty– Against Lerner)

123.    GPC repeats and realleges the allegations contained in each of the foregoing

paragraphs as if fully set forth herein.

124.    As an employee of GPC, Lerner owed to GPC various fiduciary duties, including

the duties of loyalty, candor, disclosure, and diligence.

125.    As GPC's attorney, Lerner owed to GPC various fiduciary duties, including the

duties of competence, diligence, communication, confidentiality, loyalty, zealousness, and

unconflicted representation.

126.    Among other things, Rule 1.7 of the New York Rules of Professional Conduct

prohibits a lawyer from representing a client if "there is a significant risk that the lawyer's

professional judgment on behalf of a client will be adversely affected by the lawyer's own

financial, business, property or other personal interests."  Additionally, Rule 1.8 of the New

York Rules of Professional Conduct prohibits a lawyer from using "information relating to

representation of a client to the disadvantage of the client."

127.    Upon information and belief, Lerner violated his fiduciary duties to GPC by,

among other things:  (i) approving for release a press release in violation of the License

Agreement; (ii) informing WiLAN that he would work for WiLAN even if WiLAN cancelled its

contemplated acquisition of GPC; (iii) continuing to act as GPC's employee and attorney while

he was negotiating with WiLAN for employment; (iv) failing to inform GPC that he was

negotiating with WiLAN for employment; (v) advising GPC about potential litigation against

WiLAN, and failing to take legal action against WiLAN, while simultaneously negotiating

employment with WiLAN and advising WiLAN on how to compete with GPC and prevail in

litigation against GPC;  (vi) sharing a copy of the Separation Agreement with WiLAN in

violation of the plain terms of that agreement, and in violation of Lerner's ethical obligation to

maintain the confidentiality of GPC's confidential information; (vii) otherwise disclosing GPC's

confidential information to WiLAN; and (viii) fraudulently inserting into the Draft Separation

Agreement certain proposed terms with the intention of advancing Lerner and WiLAN's interests

to the disadvantage of GPC, and then lying to GPC about the purpose and legal effect of said

proposed terms.

128.   As a consequence of the foregoing, GPC is entitled to disgorgement of any salary,

benefits, and bonuses paid by GPC to Lerner from the date of his first disloyal act, along with

compensatory and exemplary damages in an amount to be determined at trial.  GPC is also

entitled to compensatory and exemplary damages in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
### (Legal Malpractice – Against Lerner)

129.   GPC repeats and realleges the allegations contained in each of the foregoing

paragraphs as if fully set forth herein.

130.   During the course of Lerner's legal representation of GPC, Lerner failed to

exercise due care and competence as an attorney of GPC, by among other things:  (i) approving

for release a press release in violation of the License Agreement; (ii) informing WiLAN that he

would work for WiLAN even if WiLAN cancelled its contemplated acquisition of GPC; (iii)

continuing to act as GPC's employee and attorney while he was negotiating with WiLAN for

24

employment; (iv) failing to inform GPC that he was negotiating with WiLAN for employment; (v) advising GPC about potential litigation against WiLAN, and failing to take legal action against WiLAN, while simultaneously negotiating employment with WiLAN and advising WiLAN on how to compete with GPC and prevail in litigation against GPC;  (vi) sharing a copy of the Separation Agreement with WiLAN in violation of the plain terms of that agreement, and in violation of Lerner's ethical obligation to maintain the confidentiality of GPC's confidential information; (vii) otherwise disclosing GPC's confidential information to WiLAN; and (viii) fraudulently inserting into the Draft Separation Agreement certain proposed terms with the intention of advancing Lerner and WiLAN's interests to the disadvantage of GPC, and then lying to GPC about the purpose and legal effect of said proposed terms.

131.    By reason of the negligence and other legal malpractice committed by Lerner against GPC, GPC has been damaged and is entitled to compensatory and exemplary damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Fraud – Against Lerner)

132.    GPC repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

133.    Lerner inserted into the Draft Separation Agreement certain terms in an attempt to circumvent his obligations under the Non-Compete.

134.    Lerner misrepresented to GPC the purpose and effect of said proposed terms.

135.    At the time Lerner made these misrepresentations, said misrepresentations were false and Lerner knew them to be false.

136.    At the time Lerner inserted these proposed terms into the Draft Separation Agreement, Lerner also fraudulently concealed his prospective employment with WiLAN and fraudulently concealed his active efforts to circumvent his obligations under the Non-Compete.

137.    Lerner made said misrepresentations and fraudulent concealments with the intent to induce GPC to sign a separation agreement that he hoped would help him circumvent his obligations under the Non-Compete.

138.    At the time Lerner made these misrepresentations and concealments, GPC was ignorant of their falsity and could not, in the exercise of reasonable diligence, have discovered such falsity.

139.    In reasonable reliance on the above misrepresentations and fraudulent concealments by Lerner, GPC signed the Separation Agreement, which made reference to Lerner's temporary demotion in early 2010.

140.    Had GPC known that Lerner's representations were false, it would not have included said reference in the Separation Agreement.

141.    GPC was damaged by the inclusion of said terms in the Separation Agreement.

142.    As a consequence of the foregoing, GPC is entitled to reformation and/or rescission of the Separation Agreement, as well as to compensatory and exemplary damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty – Against WiLAN and Gladios)

143.    GPC repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

144.    As an employee and attorney of GPC, Lerner owed GPC various fiduciary duties.

145.    WiLAN and/or Gladios intentionally aided and abetted Lerner in his breach of his fiduciary duties to GPC.

146.    As a consequence of the foregoing, GPC was damaged and is entitled to compensatory and exemplary damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets – Against all Defendants)

147.    GPC repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

148.    The GPC Trade Secrets constitute valid, legally protectable trade secrets.

149.    The GPC Trade Secrets are highly valuable and are critical to GPC's competitiveness in the marketplace.

150.    WiLAN and/or Gladios misappropriated the GPC Trade Secrets by obtaining them under false pretenses.

151.    Lerner is in possession of the GPC Trade Secrets, subject to contractual and fiduciary confidentiality obligations and/or attorney-client privilege.

152.    Upon information and belief, Lerner has misused the GPC Trade Secrets in connection with his employment by WiLAN.

153.    Lerner will inevitably disclose and/or misuse them in connection with his employment by WiLAN, unless such employment is enjoined.

154.    Upon information and belief, WiLAN and/or Gladios have already used and/or intend to use the GPC Trade Secrets to their benefit.

155.    Accordingly, GPC is entitled to a preliminary and permanent injunction (i) barring Lerner from working with WiLAN, Gladios, and any entity engaged in enforcing the intellectual property rights of others on a contingency fee basis; (ii) barring WiLAN and Gladios

27

from employing or working with Lerner; and (iii) barring Lerner, WiLAN and Gladios from

using or disclosing GPC's trade secrets and confidential information, and is additionally entitled

to compensatory and exemplary damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
### (Unfair Competition – Against WiLAN and Gladios)

156.    GPC repeats and realleges the allegations contained in each of the foregoing

paragraphs as if fully set forth herein.

157.    Upon information and belief, WiLAN and Gladios knowingly engaged in a

conspiracy to obtain trade secrets and/or confidential information from GPC.

158.    WiLAN and Gladios unlawfully obtained trade secrets and/or confidential

information from GPC.

159.    GPC's trade secrets and confidential information include information about

GPC's clients that is not readily ascertainable.

160.    By virtue of the foregoing conduct, WiLAN and Gladios have engaged in unfair

competition against GPC and continue to unfairly compete against GPC.  WiLAN and Gladios's

acts of unfair competition include, among other things:  (i) WiLAN and Gladios's

misappropriation of GPC's trade secrets and confidential information; (ii) WiLAN's fraudulent

misrepresentations in connection with its purported intent to purchase GPC; and (iii) WiLAN

and Gladios's wrongful interference with Lerner's contractual relationship with GPC.

161.    WiLAN and Gladios's conduct has proximately caused GPC irreparable injury

and, unless enjoined, will continue to cause irreparable injury to GPC's business including,

among other things, loss of good will, reputation, client relationships, competitive advantage,

revenues and profits that are impossible to accurately and fully calculate, all of for which GPC

has no adequate remedy at law.

162.     Accordingly, GPC is entitled to a temporary restraining order and a preliminary and permanent injunction barring WiLAN and Gladios from using or disclosing GPC's trade secrets and confidential information, and is additionally entitled to compensatory and exemplary damages in an amount to be determined at trial.

**WHEREFORE**, GPC respectfully demands judgment in its favor and against Defendants, for:

a.     a preliminary and permanent injunction:

   i.   barring Lerner from working with WiLAN, Gladios, and any entity engaged in enforcing the intellectual property rights of others on a contingency fee basis;

   ii.  barring WiLAN and Gladios from employing or working with Lerner; and

   iii. barring Lerner, WiLAN and Gladios from using or disclosing GPC's trade secrets and confidential information;

b.     reformation and/or rescission of the Separation Agreement;

c.     compensatory and consequential damages in an amount to be determined at trial, such amount to be trebled;

d.     exemplary damages in an amount to be determined at trial;

e.     GPC's allowable attorneys' fees, costs, and disbursements herein; and

f.      such other and further relief as the Court may deem just and proper.

Dated:          San Diego, California
                January 30, 2012

                                        Respectfully submitted,

                                        SILVER & SILVER APC

                                        By:  _____
                                              Levi Y. Silver (LS6546)
                                              lsilver@silverlawfirm.com

                                              – and –

                                        POLTORAK PC
                                        Elie C. Poltorak (EP0770)
                                        elie@poltoraklaw.com

                                        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Levi Y. Silver, hereby certify that on January 30, 2012, copies of the annexed

documents were caused to be served upon the following counsel of record at the addresses and in

the manner indicated:

## VIA ELECTRONIC MAIL AND REGULAR MAIL

Jamie M. Brickell, Esq.
Jonathan T. Shepard, Esq.
Eric D. Dowell, Esq.
**PRYOR CASHMAN LLP**
7 Times Square
New York, NY  10036-6569
Tel:  212-421-4100
Fax:  212-326-0806
JBrickell@pryorcashman.com
JShepard@pryorcashman.com
EDowell@pryorcashman.com

*Attorneys for Defendants*
*Wi-LAN Inc.and Gladios IP Inc.*

Robert W. Forman, Esq.
**SHAPIRO FORMAN ALLEN**
  **& SAVA LLP**
380 Madison Avenue, 25th Floor
New York, NY 10017
Tel:  212-972-4900
Fax:  212-883-1941
Forman@sfa-law.com

*Attorneys for Defendant*
*Paul J. Lerner, Esq.*

Dated:   January 30, 2012

**SILVER & SILVER APC**

By: 

    Levi Y. Silver (LS6546)
    lsilver@silverlawfirm.com
    245 West 17th Street, 5th Floor
    New York, New York 10011
    Telephone:  (212) 851-6428
    Facsimile:  (619) 231-1616