Levi Y. Silver (LS6546)
lsilver@silverlawfirm.com
**SILVER & SILVER APC**
245 West 17th Street, 5th Floor
New York, New York 10011
Telephone:  (212) 851-6428
Facsimile:  (619) 231-1616

Elie C. Poltorak (EP0770)
elie@poltoraklaw.com
**POLTORAK PC**
1650 Eastern Parkway, Suite 400
Brooklyn, NY 11233
Telephone: (718) 943-8815
Facsimile: (718) 943-8816

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GENERAL PATENT CORPORATION,
ALEXANDER POLTORAK, VALERIA
POLTORAK, KATHLENE INGHAM,
POLTORAK FAMILY LLC, and ALEXANDER
POLTORAK GPC HOLDINGS LLC,

                     Plaintiffs,

           -against-

WI-LAN INC., GLADIOS IP INC.,
and PAUL J. LERNER, ESQ.

                 Defendants.

No. 11 Civ. 6585 (JFK-DCF)

**SECOND AMENDED
COMPLAINT**

Plaintiffs General Patent Corporation ("GPC"), Alexander Poltorak ("Poltorak"), Valeria

Poltorak ("Valeria"), Kathlene Ingham ("Ingham"), Poltorak Family LLC, Alexander Poltorak

GPC Holdings LLC (collectively, "Plaintiffs") by and through their undersigned attorneys, as

and for their First Amended Complaint against Defendants Wi-LAN Inc. ("WiLAN"), Gladios IP

Inc. ("Gladios") and Paul J. Lerner, Esq. ("Lerner") (collectively, "Defendants"), allege upon

personal information as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

**SUMMARY OF ACTION**

1.        This lawsuit arises out of WiLAN and Lerner's fraudulent and unlawful scheme for WiLAN to compete with GPC by misappropriating GPC's highly confidential information, and raiding its second most senior employee, Lerner, in violation of WiLAN and Lerner's contractual and fiduciary obligations to GPC.  As explained below, WiLAN gained access to the confidential and proprietary information that made GPC's business model so successful by purporting to negotiate in good faith to acquire GPC while it fraudulently withheld material information from GPC.  After it had gained virtually unfettered access to GPC's highly confidential information, WiLAN abruptly cancelled its acquisition of GPC and announced that it was opening a new office not far from GPC's headquarters, which would be headed by Lerner and which would compete directly with GPC.

**PARTIES**

2.        Plaintiff GPC is a corporation incorporated under the laws of the State of New York and having a principal office at Montebello Park, 75 Montebello Road, Suffern, New York 10901.

3.        Plaintiff Poltorak is an individual residing in New York, and is GPC's Chairman and Chief Executive Officer ("CEO").  Poltorak is a direct and/or indirect shareholder of GPC and certain affiliates of GPC, including IP Holdings LLC ("IP Holdings") and GPC Intellectual Properties LLC ("GPC IP") (collectively with GPC and IP Holdings, the "GPC Entities").

4.        Plaintiff Valeria is an individual residing in New York, and is Vice President of GPC.  Valeria is a direct and/or indirect shareholder of the GPC Entities.

2

5.      Plaintiff Ingham is an individual residing in New York, and is GPC's Director of Licensing.  Ingham is a direct and/or indirect shareholder of GPC.

6.      Plaintiff Alexander Poltorak GPC Holdings LLC is a New York limited liability company with offices at 128 W. Maple Avenue, Monsey, New York 10952.  It is a direct and/or indirect shareholder of GPC.

7.      Plaintiff Poltorak Family LLC is a Delaware limited liability company with offices at 75 Montebello Road, Suffern, New York 10901.  It is a direct and/or indirect shareholder of IP Holdings and GPC IP.

8.      Upon information and belief, defendant WiLAN is a corporation incorporated under the laws of Canada, having a principal office at 11 Holland Avenue, Suite 608, Ottawa, Ontario K1Y 4S1, Canada.  According to its 2010 Annual Report and its website, WiLAN is primarily engaged in the business of acquiring and assertively licensing patents.

9.      Upon information and belief, Defendant Gladios is a corporation that is a wholly-owned subsidiary of WiLAN, having a principal office at 1620 Scott Street, Suite 15, Ottawa, Ontario K1Y 4S1, Canada.  According to its website and WiLAN's 2010 Annual Report, Gladios is primarily engaged in the business of partnering with patent owners that wish to monetize their intellectual property by means of patent licensing and enforcement.  Gladios operates on a contingency basis, in which the original patent owners retain ownership of their patents, while Gladios manages and finances the patent licensing and enforcement campaign in return for a share of the revenues.

10.     Upon information and belief, Defendant Lerner is an individual residing at 7 White Birch Road, Madison, Connecticut  06443.  Lerner is an attorney admitted to practice in New York.  Lerner was employed by GPC since 1999 and, until September 5, 2011, held the title

of Director, Senior Vice President and General Counsel.  Lerner is also a shareholder in GPC

owning 20,000 shares of common stock, which represents approximately 2% of GPC's

outstanding shares.  Upon information and belief, Lerner became an employee of WiLAN and

Gladios on or about September 6, 2011.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1332(a)(3) in

that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and

costs, and is between citizens of different states and in which citizens or subjects of a foreign

state are additional parties.

12.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §

1391(a)(2) because a substantial part of the events or omissions giving rise to the claims

occurred there.  Additionally, Defendants WiLAN and Gladios submitted to this Court's

jurisdiction in the several agreements entered between the parties.

## FACTUAL ALLEGATIONS

**GPC's Business and the GPC Trade Secrets**

13.     GPC is "a leading patent licensing and enforcement firm"—as acknowledged by

WiLAN in a press release issued on or about September 12, 2011.  Upon information and belief,

GPC was the first such company in the United States and, likely, the world.  GPC pioneered its

business model almost 25 years ago and has been the premier player in the patent licensing

industry ever since.

14.     GPC's primary business focus is to partner with patent owners in order to license

and enforce their patents.  GPC operates on a contingency basis, in which it finances and

manages patent licensing and enforcement campaigns against suspected infringers, in return for

an ownership interest in the underlying patents entitling it to a share of the proceeds.

4

15.    GPC, including all of its affiliated and subsidiary entities, maintains its status as a leading patent licensing and enforcement company through an array of carefully honed and confidential business strategies, including, among other things:  (i) a unique and confidential internet-based marketing strategy tailored for a contingency based patent licensing and enforcement business that is responsible for the bulk of GPC's deal-flow and which was developed over many years at great expense and effort; (ii) various secondary online and traditional marketing strategies and techniques tailored for a contingency based patent licensing and enforcement business, including but not limited to various advertising venues, public relations campaigns, direct mailings, trade show participations and/or exhibitions, and viral marketing campaigns; (iii) confidential business development and partnering strategies, including various strategies uniquely geared toward a contingency-based patent licensing and enforcement business; (iv) a network of affiliates that GPC spent many years building, including patent attorneys, patent agents, licensing professionals and other individuals who source and refer prospective clients to GPC; (v) unique compensation arrangements with affiliates; (vi) unique strategies developed over the course of many years for selecting patents GPC accepts for licensing and enforcement from among the hundreds of submissions it reviews each year, and specific criteria for streamlining the patent selection process, including a confidential, detailed procedure that is followed in conducting initial analysis and subsequent in-depth due diligence on patents; (vii) well developed relationships that took years to cultivate with a number of outside vendors that play a crucial role in GPC's success, including reverse-engineering firms, offshore patent investigation firms, and U.S. patent attorneys who assist GPC in assessing the strength of submitted patents; (viii) unique business models geared toward various sorts of patent holders, including individual inventors and other non-practicing entities, practicing entities, and

universities; (ix) various crucial relationships necessary for enforcing patents against suspected infringers with little up-front capital investment that were cultivated over the course of many years, including, relationships with prominent law firms that litigate patent infringement cases on a contingency basis, including law firms that do not publicly hold themselves out as willing to handle such cases on a contingency basis; (x) a unique, cost-effective, and confidential contingency formula for compensating outside counsel; (xi) relationships with local counsel in GPC's forums of choice for litigating patent infringement cases; (xii) confidential, proprietary patent litigation strategies developed by GPC based in part on game theory, real options theory, and practical litigation experience; (xiii) elaborate and confidential litigation risk management techniques, such as proprietary decision tree analysis templates; (xiv) long-standing relationships with lenders willing to finance out-of-pocket patent litigation expenses; (xv) a proprietary set of documents governing the unique structure of GPC's relationship with clients, which are unknown to GPC's competitors; (xvi) licensing terms that GPC offers prospective licensees; (xvii) proprietary negotiation strategies; and (xviii) other proprietary know-how (collectively, the "GPC Trade Secrets").

16.     The GPC Trade Secrets were developed by GPC over a long period of time—almost a quarter century—at great expense and effort.  The GPC Trade Secrets are vital to GPC and would be highly valuable to GPC's many competitors, to GPC's detriment.  GPC takes extensive measures to guard the secrecy of the GPC Trade Secrets, including by entering confidentiality agreements with any employees or strategic partners that are likely to gain access to such information.  The GPC Trade Secrets are not generally known outside of GPC and significant safeguards are in place to prevent the disclosure of the GPC Trade Secrets.  The GPC Trade Secrets cannot easily be properly acquired or duplicated by others.

6

**The Non-Compete**

17.     As a result of his position with GPC as Senior Vice President, General Counsel, and a member of the Board of Directors and the Executive Committee, Lerner was necessarily privy to all, or virtually all, of the GPC Trade Secrets.

18.     In order to protect GPC from potential disclosure and illicit use of the GPC Trade Secrets, Lerner and GPC entered into a Confidentiality and Noncompetition Agreement, dated January 5, 2004 (the "Non-Compete").

19.     The Non-Compete was drafted by Lerner in his capacity as General Counsel of GPC.

20.     Lerner expressly acknowledged in the Non-Compete that GPC's confidential information "constitutes valuable intellectual property" of GPC and that Lerner would have access to such confidential information during the course of his employment with GPC.  Lerner further acknowledged that GPC would suffer irreparable harm if he breached, or threatened to breach, the Non-Compete.  Further, Lerner agreed that GPC would "be entitled to seek injunctive relief, both preliminary and permanent, enjoining and restraining such breach or threatened breach."

21.     The Non-Compete prohibited Lerner, during and after the term of his employment, from, directly or indirectly, using, disseminating, or disclosing to any person, firm or other business entity for any purpose whatsoever any "Confidential Information."  The Non-Compete defined "Confidential Information" as "information, not known to the general public or in the industry in which [GPC] is engaged, including but not limited to information about [GPC]'s processes, clients, services, methods, suppliers, affiliates, pricing policies and related matters, including trade secrets and know-how," with certain limited exceptions.

22.     The Non-Compete also prevented Lerner from working for any competitor of GPC within the United States for a period of one year following any termination of his employment with GPC, unless his employment was unilaterally terminated by GPC without "Cause."

## WiLAN's Unsuccessful Attempt to Legitimately Enter the Partnership Licensing Business

23.     The business model of WiLAN differs from that of GPC.  WiLAN **buys** patents for purposes of licensing and enforcement.  GPC, on the other hand, partners with patent owners to monetize their patents on a revenue-sharing basis.  In 2010, WiLAN attempted to enter the **partnership**-based licensing business through its wholly-owned subsidiary, Gladios.

24.     These attempts were largely unsuccessful.  Lacking GPC's trade secrets and know-how, Gladios was unable to either generate a substantial deal-flow or effectively monetize its clients' patents.

25.     On or about March 29, 2011, WiLAN's CEO, James Skippen ("Skippen"), stated to Poltorak, that Gladios was a failure.

## WiLAN's Fraudulent Scheme to Misappropriate GPC's Trade Secrets

26.     In or about April 2010, GPC began seeking potential strategic partners to invest in or acquire the GPC Entities.

27.     In connection with said search, GPC retained the investment banking firm Houlihan Lokey Capital, Inc., ("Houlihan").

28.     Houlihan sent a one page description of GPC, known as a "teaser," to various entities it believed might be interested in investing in or acquiring GPC.  Any interested party was required to execute a confidentiality agreement, upon which Houlihan would send the interested party a Confidential Information Memorandum ("CIM") providing further information about the GPC Entities.

29.     Lerner was listed in the CIM as a Director, Senior Vice President and General Counsel of GPC.  Lerner reviewed and approved several drafts of the CIM, including in or about September, October and November of 2010.

30.     WiLAN was among the parties approached by Houlihan as a prospective investor/acquirer.

31.     On or about November 16, 2010, WiLAN entered into a Confidentiality Agreement with Houlihan, who was acting as GPC's representative (the "Confidentiality Agreement").

32.     WiLAN agreed in the Confidentiality Agreement that GPC "is a beneficiary of this agreement."

33.     Pursuant to the Confidentiality Agreement, WiLAN was prohibited from:  (i) using the information provided by GPC for any purpose other than evaluating the proposed transaction; or (ii) soliciting GPC's employees for employment for a two year period.

34.     WiLAN acknowledged and agreed in the Confidentiality Agreement that "money damages may not be a sufficient remedy for any breach of this agreement, and that each of [GPC] and Houlihan Lokey is entitled to seek specific performance and injunctive or other equitable relief.  Such remedy shall not be deemed to be the exclusive remedy for breach of this agreement, but shall be in addition to all other remedies available at law or equity to [GPC] and Houlihan Lokey."

35.     Upon execution of the Confidentiality Agreement, Houlihan furnished the CIM to WiLAN.  The CIM provided an overview of GPC's business, including its history, strategic focus, financial performance, background of key employees, marketing strategies, organizational structure, and patent holdings.  Specifically, the CIM provided a summary of each patent

portfolio that was deemed to be valuable by GPC.  These summaries described the patented technology, licensing efforts, and the products that were thought to be infringing on the patents.

36.     In or about January 2011, GPC received preliminary non-binding expressions of interest from several parties, including WiLAN.

37.     On or about February 14, 2011, WiLAN demanded more detailed information on the GPC Entities than that provided in the CIM.  Specifically, WiLAN requested more comprehensive confidential and privileged information on the patents in which the GPC Entities held an interest.

38.     On or about February 22, 2011, GPC sent to WiLAN a list of its revenue-generating patent portfolios, indicating for each portfolio how much revenue had been derived and whether there remained any potential for further revenue.

39.     On or about February 22, 2011, WiLAN sent representatives to visit the GPC Entities for the purported purpose of assessing the desirability of the acquisition.  WiLAN also sent a list of topics relating to the GPC Entities on which it wanted more information, which included:  (i) corporate and financial information; (ii) the background of employees, as well as their compensation, and motivation to remain with the business post-acquisition; (iii) existing patent portfolios; and (iv) the pipeline of patents being submitted for consideration by prospective clients.

40.     On or about March 8, 2011, GPC and WiLAN (and their affiliates) executed a Non-Disclosure and Common Legal Interest Agreement (the "NDA").  Pursuant to the terms of the NDA, GPC agreed to provide highly-confidential information to WiLAN on the basis that "the Parties intend[ed] to enter into a relationship whereby WiLAN may acquire ownership

interests for the purposes of enforcement in some or all of" the patents in which the GPC Entities

held an interest.

41.     Upon execution of the NDA, GPC furnished WiLAN with (i) comprehensive,

highly confidential, and privileged information on the patents in which the GPC Entities had an

interest; and (ii) access to GPC's employees who were knowledgeable regarding such patents

and GPC's efforts to license and enforce them.

42.     Thereafter, WiLAN's representatives again visited GPC on or about March 10,

2011, during which visit they heard presentations from GPC's CEO and other employees and

had ample opportunity to ask questions about the GPC Entities, their strategy, employees, and

patent portfolios.

43.     On or about March 29, 2011 WiLAN's CEO Skippen and WiLAN's CFO, Shaun

McEwan, visited GPC's headquarters in Suffern, New York.

44.     On or about April 8, 2011, WiLAN offered to acquire a 100% of the GPC

Entities.

45.     The parties reached agreement on material terms of the acquisition, which were

memorialized in a Confidential Term Sheet, dated April 29, 2011 (the "Term Sheet").  The Term

Sheet required the parties to "use their collective good faith efforts to negotiate the terms of a

definitive acquisition agreement…."

46.     The Term Sheet also contained a "no shop" provision, which required GPC to

cease all discussions or negotiations with other parties regarding a potential acquisition of the

GPC Entities (the "No Shop Provisions").

47.     The Term Sheet allowed WiLAN to undertake extensive due diligence of the GPC
Entities, the scope of which WiLAN was free to determine "in its sole discretion," as is
customary in such transactions.

48.     At the time the parties executed the Term Sheet, WiLAN knew or should have
known of certain facts that materially impacted the contemplated acquisition (the "Concealed
Facts").  Specifically, WiLAN knew or should have known, among other things, that it had
granted to various companies certain blanket licenses covering all of WiLAN's existing patents,
as well as any patents that WiLAN might acquire in the future (the "After-Acquired License
Rights").  Additionally, WiLAN knew or should have known that many of the GPC Entities'
patents would be subject to such After-Acquired License Rights and would, therefore, become
worthless instantly upon WiLAN's acquisition of the GPC Entities.  Additionally, WiLAN knew
or should have known that GPC could not, consistent with its fiduciary obligations to the patent
owners on whose behalf GPC undertook to enforce such patents, take any action that would
destroy the value of said patents.

49.     WiLAN intentionally withheld the Concealed Facts from GPC in order to induce
the GPC Entities to enter several agreements, including the Confidentiality Agreement, the
NDA, and the Term Sheet, and thereafter disclose to WiLAN the highly-confidential GPC Trade
Secrets.

50.     After the parties executed the Term Sheet, WiLAN conducted extensive due
diligence of GPC's business and the GPC Trade Secrets.  Among other things, WiLAN accessed
a broad range of confidential documents relating to GPC's subsidiary patent holding companies,
patent monetization strategies, litigation strategies, marketing strategies, operations, and
financials.  The GPC Entities also provided WiLAN representatives with unlimited access to (i)

their employees (who were extensively interviewed by WiLAN representatives), (ii) confidential

files, and (iii) the server containing all of the GPC Entities' confidential electronic documents

and emails.

**WiLAN's Fraudulent Scheme is Revealed and
WiLAN Cancels the Acquisition at the Last Minute**

51.     In early June 2010, GPC began to suspect that WiLAN did not intend to follow

through with the Acquisition.  Among other things, WiLAN failed to engage outside mergers and

acquisition counsel, as is universally customary in such transactions.  Although WiLAN

identified to GPC a law firm that it purportedly intended to use, all of the legal work pertaining

to the transaction, including drafting and negotiation the acquisition agreement, was performed

by WiLAN's Corporate Secretary and Assistant General Counsel, Prashant Watchmaker, Esq.

52.     On or about June 10, 2011, GPC learned some of the Concealed Facts.

53.     On or about June 12, 2011, GPC confronted WiLAN with GPC's knowledge

regarding the Concealed Facts.  Thereafter, on or about June 19, 2011, WiLAN informed GPC

that it certainly would not be proceeding with the acquisition.

54.     GPC incurred substantial expenses in reasonable reliance on WiLAN's assurances

that it intended to acquire the GPC Entities and WiLAN's ultimate refusal to follow through with

said acquisition.  These damages include, among other things, legal fees, accounting fees,

investment banking fees, virtual document storage fees, and the diversion and distraction of

GPC's employees during the course of the contemplated acquisition.

55.     GPC also suffered substantial damages as a result of the No Shop Provisions'

limitations on its ability to pursue other suitors.

56.     GPC also suffered extensive other damages, including (as discussed below) the

loss of Lerner as an employee, as a result of WiLAN's fraudulent conduct.

**Lerner Contributed to the Acquisition's Failure by Agreeing
to Work for WiLAN even if WiLAN Cancelled The Acquisition**

57.     No later than June 19, 2011, Lerner informed WiLAN that he was prepared to

work for WiLAN whether or not the acquisition closed.  Specifically, Lerner informed WiLAN

that, should WiLAN cancel the acquisition, Lerner intended to quit his employment with GPC

and begin working for WiLAN.

58.     The aforementioned employment discussions between Lerner and WiLAN

occurred at a time during which there remained a real possibility that the acquisition would

successfully close.

59.     The aforementioned employment discussions between Lerner and WiLAN

contributed to the acquisition's failure by incentivizing WiLAN to cancel the deal and still

receive Lerner and the GPC Entities' valuable intellectual property—assets that it could have

otherwise received only in the context of the acquisition.

**For Several Months After WiLAN Cancelled
the Acquisition, Lerner Acted as a Double Agent**

60.     WiLAN cancelled the acquisition in late June 2011.

61.     Lerner remained an employee of GPC until early September 2011, when he

departed from GPC, purportedly to retire.

62.     During the time period between WiLAN's cancellation of the acquisition and

Lerner's departure from GPC, Lerner fraudulently concealed his active efforts to become

employed by WiLAN.  Moreover, during this time period, Lerner acted as a double agent,

advancing his own and WiLAN's interests to the disadvantage of GPC, in knowing violation of

his ethical and contractual obligations to GPC.

63.     Among other things, during this time period, GPC considered commencing

litigation against WiLAN for, among other things, WiLAN's fraudulent conduct in connection

14

with the acquisition.  Lerner advised GPC regarding this contemplated litigation while
fraudulently concealing his active efforts to become employed by WiLAN and the grave
conflicts of interest engendered thereby.  Additionally, during this time, GPC instructed Lerner
to take certain legal action against WiLAN and Lerner failed to do so.

64.     Additionally, during this time, Lerner advised WiLAN on how to compete with
GPC and on how to defeat GPC in a potential litigation.  For example, on or about July 18, 2011,
Lerner sent to Skippen a letter discussing certain strategies by which WiLAN could replicate
GPC's business model.  Additionally, while Lerner knew at this time that GPC was considering
litigation against WiLAN, and further understood that Lerner's prospective employment with
WiLAN would likely cause GPC to sue WiLAN, Lerner advised Skippen to locate WiLAN's
offices outside of New York, because "we are less likely to have an adverse reaction from Alex
[Poltorak of GPC] if we are in another state."

**Lerner Gave GPC Fraudulent Legal Advice in**
**Connection with His Employee Separation Agreement**

65.     On or about August 9, 2011, Lerner informed GPC that he was resigning from
GPC *to retire*.  Among other things, Lerner represented to GPC that he was tired of his long
commute and wanted to spend more time sailing and, possibly, helping his wife with her solo
law practice in Connecticut.  Additionally, on or about August 30, 2011, GPC held a retirement
party for Lerner at which Lerner was presented, as a retirement gift, with a large framed
caricature of himself next to his sail boat signed by all employees of GPC.  During all this time,
Lerner fraudulent concealed that he was in fact leaving GPC to work for WiLAN in violation of
the Non-Compete.

66.     On August 10, 2011, Lerner sent to Poltorak an email containing a draft employee
separation agreement (the "Draft Separation Agreement") memorializing certain proposed terms

of Lerner's departure from GPC.  Lerner and GPC ultimately signed a final employee separation

agreement, (the "Separation Agreement") on or about August 11, 2011.

67.     Lerner fraudulently inserted into the Draft Separation Agreement certain proposed

terms with the intention of circumventing his contractual obligation under the Non-Compete.

Moreover, on or about August 10-11, 2011, Lerner gave GPC fraudulent legal advice in

connection such proposed terms.

68.     Among other things, Lerner inserted into the Draft Separation Agreement that

"[i]t is agreed that Lerner's termination was for the convenience of GPC and without cause."

When GPC asked Lerner about the purpose and effect of this proposed term, Lerner fraudulently

advised GPC that this proposed term was relevant only to the question of whether Lerner would

be eligible for unemployment insurance, and that this clause had no other effect.

69.     Lerner's representations to GPC regarding this proposed term were fraudulent.  In

fact, Lerner inserted this proposed term into the Draft Separation Agreement because the Non-

Compete permits Lerner to work for a GPC competitor in the event he is unilaterally terminated

by GPC without cause.  Lerner knew that GPC would never agree to include this proposed term

in the final Separation Agreement if it knew that Lerner intended to work for WiLAN and/or that

this proposed term might adversely affect the enforceability of the Non-Compete.  Therefore,

Lerner fraudulently concealed the true purpose and effect of this proposed term and instead lied

to GPC about said purpose and effect.

70.     This proposed term was rejected by GPC and was not included in the final

Separation Agreement.

71.     Lerner also inserted into the Draft Separation Agreement a reference to a time that

Lerner was temporarily demoted in early 2010.  When GPC inquired of Lerner about this

16

reference, Lerner advised GPC that this reference was designed to protect GPC—for example from severance claims—and that this language had no other purpose or effect.

72.   Lerner's representations about this reference were fraudulent.  In fact, Lerner inserted this reference into the Draft Separation Agreement in order to give the false impression that Lerner had been terminated by GPC in early 2010—more than one year earlier—and thereby circumvent the strictures of the Non-Compete, which prevented Lerner from working for certain competitors of GPC for one year following the termination of his employment.

**Lerner Shared a Copy of the Separation Agreement with WiLAN
in Plain Breach of Said Agreement and in Violation of His Duty
to Maintain the Confidentiality of GPC's Confidential Information**

73.   Section 5.A. of the Separation Agreement requires Lerner, with certain exceptions not applicable here, to keep the terms of the Separation Agreement completely confidential. Lerner knowingly breached this provision, and his ethical and contractual duties to his GPC, by giving to WiLAN a copy of the Separation Agreement.

**WiLAN Announces Its Employment of Lerner**

74.   On or about September 12, 2011, WiLAN issued a press release stating that Lerner had joined WiLAN's senior management team in the position of Senior Legal Counsel and that Lerner would be establishing a WiLAN office in Stamford, Connecticut.  WiLAN's press release also stated that "[i]n particular, [Lerner's] expertise will support the growth of WiLAN's partnership licensing business, that is championed by its subsidiary, Gladios," which competes directly with GPC.

**Lerner Committed Further Legal Malpractice in**
**Connection with His Negligent Breach of a License Agreement**

75.    On or about July 6, 2011, GPC entered into a "Confidential Settlement and Non-Exclusive Patent License Agreement" (the "License Agreement") with a third party (the "License Agreement Counterparty").

76.    Under the terms of the License Agreement, the License Agreement Counterparty was required to pay GPC certain monies in settlement of certain litigation between GPC and the License Agreement Counterparty.

77.    The License Agreement also contained a confidentiality clause, which provided that "No public statement shall be made regarding this Agreement."

78.    Lerner negotiated the terms of the License Agreement with the License Agreement Counterparty on behalf of GPC, and specifically negotiated the above-referenced confidentiality clause.

79.    Notwithstanding the above-referenced confidentiality clause, Lerner, as GPC's General Counsel, approved for release a press release making certain public statements about the License Agreement.

80.    As a direct result of Lerner's negligence and legal malpractice, and GPC's consequent release of the aforementioned press release, GPC had to enter a subsequent settlement agreement with the License Agreement Counterparty, which reduced the amount to be paid by the License Agreement Counterparty to GPC by $30,000.

## FIRST CAUSE OF ACTION
### (Breach of Contract (Non-Compete) – By GPC Against Lerner)

81.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

82.    The Non-Compete prohibits Lerner from, among other things:  (i) working with a competitor of GPC for a period of one year following the termination of his employment with GPC; and (ii) using, disseminating, or disclosing to any person, firm or other business entity for any purpose whatsoever, either directly or indirectly, any of GPC's "Confidential Information."

83.    The Non-Compete is reasonable in time and is necessary to protect GPC's legitimate interests, not harmful to the public, and not unreasonably burdensome to Lerner.

84.    The Non-Compete further narrows its scope by stating: "Nothing in this agreement, however, shall in any way bar employee from employment by a law firm, including [Lerner's] own law firm, or from carrying on the normal functions, duties and practices of a patent attorney."

85.    By commencing employment with WiLAN, Lerner has breached, and/or is about to breach, the foregoing obligations.

86.    Lerner's conduct has caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

87.    Lerner expressly agreed to the issuance of an injunction to enforce his obligations in the Non-Compete.  Lerner further agreed that the issuance of an injunction "shall be in addition to all other remedies available to [GPC] in law or in equity including but not limited to [GPC]'s right to recover from [Lerner] any and all damages that may be sustained as a result [Lerner]'s breach.  Lerner further agreed that "[a]ll rights and obligations of the parties pursuant [the Non-Compete] shall survive any termination" of Lerner's employment with GPC.

19

88.     Accordingly, GPC is entitled to a preliminary and permanent injunction barring Lerner from working for WiLAN in violation of the Non-Compete, and is additionally entitled to compensatory damages for any breaches by Lerner in his contractual obligations, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Contract (Non-Compete) – By GPC Against WiLAN and Gladios)

89.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

90.     The Non-Compete is a valid, binding agreement between GPC and Lerner.

91.     WiLAN and Gladios are, and at all relevant times were, aware of the confidentiality and non-competition provisions of the Non-Compete.

92.     With full and complete knowledge of the confidentiality and non-competition provisions of the Non-Compete, WiLAN and/or Gladios have induced Lerner to breach such provisions.

93.     WiLAN and/or Gladios are employing Lerner in violation of the Non-Compete.

94.     No reasonable justification or excuse exists for Lerner's breach of the Non-Compete and/or WiLAN interference with it.

95.     GPC has sustained damages as a result of Lerner's breach of the Non-Compete.

96.     As a consequence of the foregoing, GPC is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Breach of Contract (Non-Solicit) – GPC Against WiLAN)

97.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

98.     The Confidentiality Agreement contains a non-solicitation clause (the "Non-Solicit"), which prohibits WiLAN, with certain limited exceptions, from "solicit[ing] for employment any [GPC] employees to whom [WiLAN was] introduced or with whom [WiLAN] otherwise had contact as a result of [its] consideration of a Transaction for a period of two years after the date of [the Confidentiality Agreement]."

99.     Upon information and belief, WiLAN solicited Lerner for employment, in violation of the Non-Solicit.

100.     The foregoing has caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of Lerner's valuable services, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

101.     Accordingly, GPC is entitled to a preliminary and permanent injunction barring WiLAN from employing Lerner in violation of the Non-Solicit, and is additionally entitled to compensatory damages for any breaches by WiLAN in its contractual obligations, in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract (Confidentiality Agreement) – By GPC Against WiLAN)**

102.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

103.     In the Confidentiality Agreement, WiLAN agreed that it would use all information, with certain exceptions, concerning GPC, together with any and all analyses or other documents prepared by WiLAN or any of your its, employees, advisors, attorneys, accountants, consultants, subcontractors, representatives or lending institutions which contain or

21

otherwise reflect such information, "solely for the purpose of evaluating the Transaction between [GPC] and [WiLAN]."

104.     WiLAN breached the Confidentiality Agreement by, among other things:  (i) using information about GPC that it obtained from GPC in order to solicit and then hire Lerner, which was not done for the purpose of evaluating the propose acquisition, and which was detrimental to the interests of GPC; (ii) using such information to wrongfully compete with GPC.

105.     The foregoing has caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of Lerner's valuable services, loss of good will, reputation, client relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

106.     Accordingly, GPC is entitled to a preliminary and permanent injunction barring WiLAN from continuing to use GPC's Confidential Information, and is additionally entitled to compensatory damages for any breaches by WiLAN in its contractual obligations, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**<u>(Breach of Contract (NDA) – By GPC Against WiLAN)</u>**

107.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

108.     In the NDA, WiLAN agreed to not use the GPC Entities' "Confidential Information" "for any reason or purpose other than to evaluate the Opportunity."

109.     The NDA defines "Confidential Information," with certain exceptions, as "any information or documentation that has been or may be provided or disclosed in any manner whatsoever (including orally) by [the GPC Entities] to [WiLAN] in connection with the

Opportunity and/or in connection with any potential acquisition, prosecution, exploitation and/or defense of [the GPC Entities'] Portfolios . . ."

110.    In the NDA, WiLAN further agreed not to use any of the GPC Entities' Confidential Information "in any manner that is Detrimental to the interests of [the GPC Entities]."

111.    The NDA further provides as follows:

> Each Receiving Party [including WiLAN] hereby agrees to indemnify and hold harmless each Disclosing Party [GPC] and its affiliates from any damage, loss, cost or liability (and all legal fees and the cost of enforcing this indemnity) arising out of or resulting from any unauthorized use or disclosure by such Receiving Party or any of its Representatives of any Confidential Information of such Disclosing Party.   Each Receiving Party also acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such Receiving Party or any of its Representatives relating to a Disclosing Party's Confidential Information and that any such breach would cause such Disclosing Party and its affiliates irreparable harm.   Accordingly, each Receiving Party also agrees that in the event of any breach or threatened breach of this Agreement relating to a Disclosing Party's Confidential Information, such Disclosing Party, in addition to any other remedies at law or in equity it may have, shall be entitled to equitable relief, including injunctive relief and specific performance, without the requirement of posting a bond or other security.

112.    WiLAN breached the NDA by, among other things:  (i) using the Confidential Information in order to solicit and then hire Lerner, which not done for the purpose of evaluating the propose acquisition, and which was detrimental to the interests of GPC; (ii) using Confidential information to wrongfully compete with GPC.

113.    The foregoing has caused GPC irreparable injury and, unless enjoined, will continue to cause irreparable injury to GPC's business including, among other things, loss of Lerner's valuable services, loss of good will, reputation, client relationships, competitive

advantage, revenues and profits that are impossible to accurately and fully calculate, all of for which GPC has no adequate remedy at law.

114.    Accordingly, GPC is entitled to a preliminary and permanent injunction barring WiLAN from continuing to use the GPC Entities' Confidential Information, and is additionally entitled to compensatory damages for any breaches by WiLAN in its contractual obligations, in an amount to be determined at trial.

115.    In accordance with the terms of the NDA, GPC is also entitled to recover the legal fees and costs it incurs in connection with this action.

**SIXTH CAUSE OF ACTION**
**(Breach of Contract to Negotiate In Good Faith – By All Plaintiffs Against WiLAN)**

116.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

117.    The Term Sheet was entered into by, among others:  (i) WiLAN; (ii) GPC, for its own benefit and for the benefit of all shareholders of the GPC Entities, including Poltorak, Valeria, Ingham, Poltorak Family LLC, Alexander Poltorak GPC Holdings LLC, GPC Poltorak Family Trust, and Alexander I. Poltorak 2008 Grantor Retained Annuity Trust (collectively, the "GPC Entity Shareholders"); (iii) Poltorak, for his own benefit and for the benefit of Poltorak Family LLC, Alexander Poltorak GPC Holdings LLC, and Alexander I. Poltorak 2008 Grantor Retained Annuity Trust; (iv) Valeria, for her own benefit and for the benefit of GPC Poltorak Family Trust; and (v) Ingham, for her own benefit.

118.    In the Term Sheet, WiLAN agreed that "[t]he parties and GPC shall use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement relating to the Proposed Acquisition (the 'Definitive Agreement') to be executed on the Closing Date."

119.    WiLAN failed to use good faith efforts to negotiate the terms of a definite

acquisition agreement, in violation of the Term Sheet.

120.    The proposed acquisition failed as a result thereof.

121.    Plaintiffs were damaged thereby.

122.    As a consequence of the foregoing, Plaintiffs are entitled to compensatory and

exemplary damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**<u>(Fraud (Confidential Information) – By GPC Against WiLAN)</u>**

123.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing

paragraphs as if fully set forth herein.

124.    On November 16, 2010—the very day WiLAN signed the Confidentiality

Agreement—WiLAN's Chief Financial Officer, Shawn McEwen, who signed the Confidentiality

Agreement on WiLAN's behalf, sent an email to certain WiLAN executives, stating that, "I

figure there is no harm in getting the actual book on this.  We can at the very least get insight

into this operating model.  Thoughts?"   In a candid expression of WiLAN's thinking at the time,

Cory Houston, WiLAN's Vice President and primary dealmaker on the proposed acquisition,

replied as follows:  "Agreed.  Always good to get a data point to benchmark our business.

Tunnel vision and group think are the biggest detriments in developing a sound business strategy

so ***it's good to get a peek under the covers on a competitor's business structure***."  (Emphasis

added.)

125.    In the Confidentiality Agreement, WiLAN represented that it would use all

information, with certain exceptions, concerning GPC, together with any and all analyses or

other documents prepared by WiLAN or any of your its, employees, advisors, attorneys,

accountants, consultants, subcontractors, representatives or lending institutions which contain or

25

otherwise reflect such information, "solely for the purpose of evaluating the Transaction between [GPC] and [WiLAN]."

126.    In the NDA, WiLAN represented that it would not use the GPC Entities' "Confidential Information" (as that term is defined in the NDA) "for any reason or purpose other than to evaluation the Opportunity," and further agreed that it would not use such information "in any manner that is detrimental to the interests of [the GPC Entities]."

127.    At the time WiLAN made there representations, they were false, and WiLAN knew them to be false.  Specifically, WiLAN knew at the time it entered these agreements that: (i) it had no intention of maintaining the confidentiality of this information; (ii) it had no intention of using this information for the sole purpose of evaluating the proposed acquisition; and (iii) it had no intention to not use this information in any manner that its detrimental to the interests of GPC.

128.    WiLAN made these misrepresentations with the intent to induce Plaintiffs to, among other things, provide WiLAN with broad access to GPC's confidential information and to GPC's employees, so that WiLAN could use such information and access for its own benefit and in violation of the Confidentiality Agreement and the NDA.

129.    At the time WiLAN made these misrepresentations, Plaintiffs were ignorant of their falsity and could not, in the exercise of reasonable diligence, have discovered such falsity.

130.    In reliance on the above representations by WiLAN, GPC provided WiLAN broad access to its confidential information and its employees, and expended significant time, resources and money in connection with the proposed acquisition, including, among other things, on legal fees, accounting fees, investment banking fees, virtual document storage fees, and the diversion and distraction of GPC's employees during the course of the contemplated acquisition.

131.     Had GPC known that WiLAN's representations were false, it would not have provided WiLAN broad access to its confidential information and its employees, and would not have expended significant time, resources and money in connection with the proposed acquisition.

132.     As a result of WiLAN's fraud, Plaintiffs suffered significant damages, including, among other things, the loss of Lerner from its employ, Defendants' wrongful use of its confidential information, and the significant time, resources and money it expended in connection with the proposed acquisition.

133.     As a consequence of the foregoing, GPC is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
### (Fraud (Term Sheet) – By All Plaintiffs Against WiLAN)

134.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

135.     On or about April 8, 2011, WiLAN tendered an offer to acquire 100% of the GPC Entities.  WiLAN's offer was memorialized in the Term Sheet dated April 29, 2011.

136.     In the Term Sheet, WiLAN represented that, subject to its satisfactory due diligence and board approval "the Parties expect that the Proposed Acquisition will be consummated on or about May 27, 2011 or such other date to which the Parties may agree."

137.     WiLAN further represented in the Term Sheet that "[t]he parties shall use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement relating to the Proposed Acquisition."

138.     At the time WiLAN made these representations, said representations were false and WiLAN knew them to be false.  Among other things, at the time WiLAN made these

27

representations, it knew of the Concealed Facts, which materially and adversely affected its ability to acquire the GPC Entities.

139.     WiLAN made said representations with the intent to induce Plaintiffs to, among other things:  (i) cease all negotiations with other potential purchasers of GPC; and (ii) provide WiLAN broad access to the GPC Trade Secrets and other confidential information, and to GPC's employees.

140.     At the time WiLAN made these representations, Plaintiffs were ignorant of their falsity and could not, in the exercise of reasonable diligence, have discovered such falsity.

141.     In reliance on the above representations by WiLAN, GPC provided WiLAN broad access to its confidential information and its employees, and expended significant time, resources and money in connection with the proposed acquisition, including, among other things, on legal fees, accounting fees, investment banking fees, virtual document storage fees, and the diversion and distraction of GPC's employees during the course of the contemplated acquisition.

142.     Had GPC known that WiLAN's representations were false, it would not have provided WiLAN broad access to its confidential information and its employees, and would not have expended significant time, resources and money in connection with the proposed acquisition.

143.     As a result of WiLAN's fraud, Plaintiffs suffered significant damages, including, among other things, the loss of Lerner from its employ, Defendants' wrongful use of its confidential information, and the significant time, resources and money it expended in connection with the proposed acquisition.

144.     As a consequence of the foregoing, GPC is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing – By All Plaintiffs Against WiLAN)

145.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

146.    Under New York law, an implied covenant of good faith and fair dealing between Plaintiffs and WiLAN arose in connection with the various written contracts between them, including the Confidentiality Agreement, the NDA, and the Term Sheet.

147.    WiLAN failure to disclose to GPC that it would use the GPC Entities' confidential information for purposes other than evaluating the proposed transaction, and to GPC's detriment, constituted a breach of WiLAN's covenant of good faith and fair dealing.

148.    WiLAN's failure to disclose the Concealed Facts to Plaintiffs during the course of said contractual relationship, or inform GPC that the Concealed Facts materially and adversely affected the contemplated acquisition constituted a breach of WiLAN's covenant of good faith and fair dealing.

149.    WiLAN's employment of Lerner constituted a breach of WiLAN's covenant of good faith and fair dealing.

150.    WiLAN's failure to negotiate in good faith constituted a breach of WiLAN's covenant of good faith and fair dealing.

151.    WiLAN's cancellation of the proposed acquisition was in bad faith and was, therefore, in further violation of the WiLAN's covenant of good faith and fair dealing.

152.    As a consequence of the foregoing, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
**(Tortious Interference with Contract (Non-Solicit) – by GPC Against Lerner)**

153.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

154.    The Non-Solicit is a valid, binding agreement.

155.    Lerner is, and at all relevant times was, aware of the Non-Solicit.

156.    With full and complete knowledge of Non-Solicit, Lerner induced WiLAN to breach the Non-Solicit.

157.    WiLAN and/or Gladios employed Lerner in violation of the Non-Solicit.

158.    No reasonable justification or excuse exists for WiLAN's breach of the Non-Solicit and/or Lerner's interference with it.

159.    GPC has sustained damages as a result of WiLAN's breach of the Non-Solicit.

160.    As a consequence of the foregoing, GPC is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
**(Tortious Interference with Contract (Confidentiality Agreement) – By GPC Against Lerner)**

161.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

162.    The Confidentiality Agreement is a valid, binding agreement.

163.    Lerner is, and at all relevant times was, aware of the Confidentiality Agreement.

164.    With full and complete knowledge of Confidentiality Agreement, Lerner induced WiLAN to breach the Confidentiality Agreement by, among other things, negotiating with WiLAN for his own employment and instructing WiLAN to use the GPC Entities' confidential information for the purposes of evaluating his prospective employment.

165.     Upon information and belief, Lerner informed WiLAN that he would use and/or disclose the GPC Entities' confidential information—including the GPC Entities' confidential marketing strategies, intake, triage and patent selection and enforcement processes and proprietary methods, know-how, and other valuable intellectual property—in connection with his prospective employment at WiLAN.

166.     Lerner used and/or disclosed the GPC Entities' Confidential Information in connection with his prospective employment at WiLAN and will continue doing so unless restrained.

167.     No reasonable justification or excuse exists for WiLAN's breach of the Confidentiality Agreement and/or Lerner's interference with it.

168.     GPC has sustained damages as a result of WiLAN's breach of the Confidentiality Agreement.

169.     As a consequence of the foregoing, GPC is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

**TWELFTH CAUSE OF ACTION**
**(Tortious Interference with Contract (NDA) – By GPC Against Lerner)**

170.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

171.     The NDA is a valid, binding agreement.

172.     Lerner is, and at all relevant times was, aware of the NDA.

173.     With full and complete knowledge of NDA, Lerner induced WiLAN to breach the NDA by, among other things, negotiating with WiLAN for his own employment and instructing WiLAN to use the GPC Entities' Confidential Information (as that term is defined in the NDA) for the purposes of evaluating his prospective employment.

31

174.     Upon information and belief, Lerner informed WiLAN that he would use and/or disclose the GPC Entities' Confidential Information—including GPC's confidential marketing strategies, intake, triage and patent selection and enforcement processes and proprietary methods, know-how, and other valuable intellectual property—in connection with his prospective employment at WiLAN.

175.     Lerner used and/or disclosed the GPC Entities' Confidential Information in connection with his prospective employment at WiLAN and will continue doing so unless restrained.

176.     No reasonable justification or excuse exists for WiLAN's breach of the NDA and/or Lerner's interference with it.

177.     GPC has sustained damages as a result of WiLAN's breach of the NDA.

178.     As a consequence of the foregoing, GPC is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

### THIRTEENTH CAUSE OF ACTION
### (Tortious Interference with Contract (Term Sheet) – By All Plaintiffs Against Lerner)

179.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

180.     The Term Sheet is a valid, binding agreement.

181.     In the Term Sheet, WiLAN agreed that "[t]he parties and GPC shall use their collective good faith efforts to negotiate the terms of a definitive acquisition agreement relating to the Proposed Acquisition (the 'Definitive Agreement') to be executed on the Closing Date."

182.     Lerner is, and at all relevant times was, aware of the Term Sheet.

183.     With full and complete knowledge of Term Sheet, Lerner induced WiLAN to breach the Term Sheet by, among other things, negotiating with WiLAN for his own

employment, and thereby incentivizing WiLAN to cancel the acquisition and still receive Lerner and the GPC Entities' confidential marketing strategies, intake, triage and patent selection and enforcement processes and proprietary methods, know-how, and other valuable intellectual property, which were known by Lerner.

184.    WiLAN failed to use good faith efforts to negotiate the terms of a definite acquisition agreement, in violation of the Term Sheet.

185.    No reasonable justification or excuse exists for WiLAN's breach of the Term Sheet and/or Lerner's interference with it.

186.    GPC has sustained damages as a result of WiLAN's breach of the Term Sheet.

187.    As a consequence of the foregoing, GPC is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

**FOURTEENTH CAUSE OF ACTION**
**(Tortious Interference with Prospective Economic Advantage –**
**By All Plaintiffs Against Lerner)**

188.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

189.    During the time period prior to WiLAN's cancellation of the proposed acquisition, Lerner knew of WiLAN's proposed acquisition of the GPC Entities.

190.    Lerner intentionally interfered with the proposed acquisition by, among other things, negotiating with WiLAN for his own employment, and thereby incentivizing WiLAN to cancel the acquisition and still receive Lerner and the GPC Entities' confidential marketing strategies, intake, triage and patent selection and enforcement processes and proprietary methods, know-how, and other valuable intellectual property, which were known by Lerner.

191.    Upon information and belief Lerner's interference prevented the proposed acquisition from successfully closing.

33

192.    Lerner's interference was done by wrongful means.

193.    Plaintiffs have been damaged thereby.

194.    As a consequence of the foregoing, Plaintiffs are entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

### FIFTEENTH CAUSE OF ACTION
### (Fraud – By GPC Against Lerner)

195.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

196.    Lerner inserted into the Draft Separation Agreement certain terms in an attempt to circumvent his obligations under the Non-Compete.

197.    Lerner misrepresented to GPC the purpose and effect of said proposed terms.

198.    At the time Lerner made these misrepresentations, said misrepresentations were false and Lerner knew them to be false.

199.    At the time Lerner inserted these proposed terms into the Draft Separation Agreement, Lerner also fraudulently concealed his prospective employment with WiLAN and fraudulently concealed his active efforts to circumvent his obligations under the Non-Compete.

200.    Lerner made said misrepresentations and fraudulent concealments with the intent to induce GPC to sign a separation agreement that he hoped would help him circumvent his obligations under the Non-Compete.

201.    At the time Lerner made these misrepresentations and concealments, GPC was ignorant of their falsity and could not, in the exercise of reasonable diligence, have discovered such falsity.

202.     In reasonable reliance on the above misrepresentations and fraudulent concealments by Lerner, GPC signed the Separation Agreement, which made reference to Lerner's temporary demotion in early 2010.

203.     Had GPC known that Lerner's representations were false, it would not have included said reference in the Separation Agreement.

204.     GPC was damaged by the inclusion of said terms in the Separation Agreement.

205.     As a consequence of the foregoing, GPC is entitled to reformation and/or rescission of the Separation Agreement, as well as to compensatory, exemplary and punitive damages in an amount to be determined at trial.

## SIXTEENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty –  By GPC Against Lerner)

206.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

207.     As an employee, director and officer of GPC, Lerner owed to GPC various fiduciary duties, including the duties of loyalty, candor, disclosure, and diligence.

208.     As GPC's attorney, Lerner owed to GPC various fiduciary duties, including the duties of competence, diligence, communication, confidentiality, loyalty, zealousness, and unconflicted representation.

209.     Among other things, Rule 1.7 of the New York Rules of Professional Conduct prohibits a lawyer from representing a client if "there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests."  Additionally, Rule 1.8 of the New York Rules of Professional Conduct prohibits a lawyer from using "information relating to representation of a client to the disadvantage of the client."

210.     Upon information and belief, Lerner violated his fiduciary duties to GPC by, among other things:  (i) approving for release a press release in violation of the License Agreement; (ii) informing WiLAN that he would work for WiLAN even if WiLAN cancelled its contemplated acquisition of GPC; (iii) continuing to act as GPC's employee and attorney while he was negotiating with WiLAN for employment; (iv) failing to inform GPC that he was negotiating with WiLAN for employment; (v) advising GPC about potential litigation against WiLAN, and failing to take legal action against WiLAN, while simultaneously negotiating employment with WiLAN and advising WiLAN on how to compete with GPC and prevail in litigation against GPC;  (vi) sharing a copy of the Separation Agreement with WiLAN in violation of the plain terms of that agreement, and in violation of Lerner's ethical obligation to maintain the confidentiality of GPC's confidential information; (vii) otherwise disclosing GPC's confidential information to WiLAN; and (viii) fraudulently inserting into the Draft Separation Agreement certain proposed terms with the intention of advancing Lerner and WiLAN's interests to the disadvantage of GPC, and then lying to GPC about the purpose and legal effect of said proposed terms.

211.     As a consequence of the foregoing, GPC is entitled to disgorgement of any salary, benefits, and bonuses paid by GPC to Lerner from the date of his first disloyal act, along with compensatory, exemplary and punitive damages in an amount to be determined at trial.

### SEVENTEENTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty – By GPC Against WiLAN and Gladios)

212.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

213.     As an employee, officer, director and attorney of GPC, Lerner owed GPC various fiduciary duties.

36

214.     WiLAN and/or Gladios intentionally aided and abetted Lerner in his breach of his fiduciary duties to GPC.

215.     As a consequence of the foregoing, GPC was damaged and is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

## EIGHTEENTH CAUSE OF ACTION
### (Legal Malpractice – By GPC Against Lerner)

216.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

217.     During the course of Lerner's legal representation of GPC, Lerner failed to exercise due care and competence as an attorney of GPC, by among other things:  (i) approving for release a press release in violation of the License Agreement; (ii) informing WiLAN that he would work for WiLAN even if WiLAN cancelled its contemplated acquisition of GPC; (iii) continuing to act as GPC's employee and attorney while he was negotiating with WiLAN for employment; (iv) failing to inform GPC that he was negotiating with WiLAN for employment; (v) advising GPC about potential litigation against WiLAN, and failing to take legal action against WiLAN, while simultaneously negotiating employment with WiLAN and advising WiLAN on how to compete with GPC and prevail in litigation against GPC;  (vi) sharing a copy of the Separation Agreement with WiLAN in violation of the plain terms of that agreement, and in violation of Lerner's ethical obligation to maintain the confidentiality of GPC's confidential information; (vii) otherwise disclosing GPC's confidential information to WiLAN; and (viii) fraudulently inserting into the Draft Separation Agreement certain proposed terms with the intention of advancing Lerner and WiLAN's interests to the disadvantage of GPC, and then lying to GPC about the purpose and legal effect of said proposed terms.

218.     By reason of the negligence and other legal malpractice committed by Lerner against GPC, GPC has been damaged and is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

### NINETEENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty – By All Plaintiffs Against Lerner)

219.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

220.     As a director and officer of GPC, Lerner owed to GPC's shareholders various fiduciary duties, including the duties of loyalty, candor, disclosure, and diligence.

221.     As an attorney negotiating with WiLAN for the sale of the GPC Entities, Lerner owed the GPC Entity Shareholders various fiduciary duties, including duties of competence, diligence, communication, confidentiality, loyalty, zealousness, and unconflicted representation.

222.     Lerner breached his fiduciary duties to Plaintiffs by, among other things, negotiating with WiLAN for his own employment, thereby incentivizing WiLAN to cancel the acquisition and still receive Lerner and the GPC Entities' confidential marketing strategies, intake, triage and patent selection and enforcement processes and proprietary methods, know-how, and other valuable intellectual property, which were known by Lerner.

223.     As a consequence of the foregoing, Plaintiffs are entitled to disgorgement of any salary, benefits, and bonuses paid by GPC to Lerner from the date of his first disloyal act, along with compensatory, exemplary and punitive damages in an amount to be determined at trial.

### TWENTIETH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty –
### By All Plaintiffs Against WiLAN and Gladios)

224.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

225.     As an employee, officer, director and attorney, Lerner owed Plaintiffs various fiduciary duties.

226.     WiLAN and/or Gladios intentionally aided and abetted Lerner in his breach of his fiduciary duties to Plaintiffs.

227.     As a consequence of the foregoing, GPC was damaged and is entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

### TWENTY-FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets – by GPC Against all Defendants)

228.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

229.     The GPC Trade Secrets constitute valid, legally protectable trade secrets.

230.     The GPC Trade Secrets are highly valuable and are critical to GPC's competitiveness in the marketplace.

231.     WiLAN and/or Gladios misappropriated the GPC Trade Secrets by obtaining them under false pretenses.

232.     Lerner is in possession of the GPC Trade Secrets, subject to contractual and fiduciary confidentiality obligations and/or attorney-client privilege.

233.     Upon information and belief, Lerner has misused the GPC Trade Secrets in connection with his employment by WiLAN.

234.     Lerner will inevitably disclose and/or misuse them in connection with his employment by WiLAN, unless such employment is enjoined.

235.     Upon information and belief, WiLAN and/or Gladios have already used and/or intend to use the GPC Trade Secrets to their benefit.

236.     Accordingly, GPC is entitled to a preliminary and permanent injunction (i) barring Lerner from working with WiLAN, Gladios, and any entity engaged in enforcing the intellectual property rights of others on a contingency fee basis; (ii) barring WiLAN and Gladios from employing or working with Lerner; and (iii) barring Lerner, WiLAN and Gladios from using or disclosing GPC's trade secrets and confidential information, and is additionally entitled to compensatory, exemplary and punitive damages in an amount to be determined at trial.

### TWENTY-SECOND CAUSE OF ACTION
### (Unjust Enrichment – By All Plaintiff Against WiLAN and Gladios)

237.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

238.     WiLAN and Gladios were unjustly enriched at the expense of Plaintiffs by, among other things, wrongfully hiring Lerner and cancelling the proposed acquisition, and wrongfully taking the GPC Trade Secrets, and the GPC Entities' confidential information, processes, know-how and other valuable property.

239.     WiLAN and Gladios benefited as a result of their wrongful actions.

240.     In equity and good conscience, Plaintiffs are entitled to restitution for WiLAN and Gladios's unjust enrichment.

### TWENTY-THIRD CAUSE OF ACTION
### (Unjust Enrichment – by GPC Against Lerner)

241.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

242.     Lerner was unjustly enriched at the expense of Plaintiffs by, among other things, securing lucrative employment with WiLAN and/or Gladios at Plaintiffs' expense.

243.     Lerner benefited as a result of his wrongful actions, in the form of lucrative employment with WiLAN and/or Gladios.

244.     Lerner's enrichment was at the expense of Plaintiffs, insofar as, among other things:  (i) Lerner and WiLAN's employment discussions caused the acquisition to fail; (ii) Lerner and WiLAN used the GPC Entities' confidential information in connection with their employment discussions; (iii) Lerner's employment with WiLAN deprives GPC of Lerner's valuable services; and (iv) Lerner's employment with WiLAN, and his use of the GPC's processes, confidential information, know-how, and other valuable intellectual property in connection with such employment, has damaged and will continue to damage the GPC Entities.

245.     In equity and good conscience, Plaintiffs are entitled to restitution for Lerner's unjust enrichment.

### TWENTY-FOURTH CAUSE OF ACTION
### (Unfair Competition – By GPC Against WiLAN and Gladios)

246.     Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

247.     Upon information and belief, WiLAN and Gladios knowingly engaged in a conspiracy to obtain the GPC Trade Secrets, confidential information and/or employees from the GPC Entities.

248.     WiLAN and Gladios unlawfully obtained the GPC Trade Secrets, confidential information and Lerner from the GPC Entities.

249.     The GPC Trade Secrets and confidential information include information about GPC's clients and professional contacts that is not readily ascertainable.

250.     By virtue of the foregoing conduct, WiLAN and Gladios have engaged in unfair competition against GPC and continue to unfairly compete against GPC.  WiLAN and Gladios's acts of unfair competition include, among other things:  (i) WiLAN and Gladios's misappropriation of the GPC Trade Secrets and confidential information; (ii) WiLAN's

fraudulent misrepresentations in connection with its purported intent to purchase the GPC

Entities; (iii) WiLAN and Gladios's wrongful interference with Lerner's contractual relationship

with GPC; and (iv) WiLAN and Gladios's wrongful competition with GPC.

251.    WiLAN and Gladios's conduct has proximately caused GPC irreparable injury

and, unless enjoined, will continue to cause irreparable injury to GPC's business including,

among other things, loss of good will, reputation, client relationships, competitive advantage,

revenues and profits that are impossible to accurately and fully calculate, all of for which GPC

has no adequate remedy at law.

252.    Accordingly, GPC is entitled to a temporary restraining order and a preliminary

and permanent injunction barring WiLAN and Gladios from using or disclosing the GPC Trade

Secrets and confidential information, and is additionally entitled to compensatory, exemplary

and punitive damages in an amount to be determined at trial.

**WHEREFORE**:

a.   GPC respectfully demands judgment in its favor and against Defendants, for:

i.   a preliminary and permanent injunction:

1.   barring Lerner from working with WiLAN, Gladios, and any entity engaged in enforcing the intellectual property rights of others on a contingency fee basis;

2.   barring WiLAN and Gladios from employing or working with Lerner; and

3.   barring Lerner, WiLAN and Gladios from using or disclosing GPC's trade secrets and confidential information;

ii.   reformation and/or rescission of the Separation Agreement;

iii.   compensatory and consequential damages in an amount to be determined at trial, such amount to be trebled;

iv.   restitution in the amount of WiLAN's unjust enrichment;

      v.   exemplary damages in an amount to be determined at trial;

     vi.   punitive damages in an amount to be determined at trial;

    vii.   GPC's allowable attorneys' fees, costs, and disbursements herein; and

   viii.   such other and further relief as the Court may deem just and proper.

b.  Poltorak, Veleria, Ingham, Poltorak Family LLC and Alexander Poltorak GPC Holdings LLC respectfully demand judgment in their favor and against Defendants, for:

      i.   compensatory and consequential damages in an amount to be determined at trial, such amount to be trebled;

     ii.   exemplary damages in an amount to be determined at trial;

    iii.   punitive damages in an amount to be determined at trial;

    iv.   GPC's allowable attorneys' fees, costs, and disbursements herein; and

     v.   such other and further relief as the Court may deem just and proper.

Dated:      March 21, 2012

Respectfully submitted,

**SILVER & SILVER APC**

By:    /s/
       Levi Y. Silver (LS6546)
       lsilver@silverlawfirm.com

– and –

**POLTORAK PC**
Elie C. Poltorak (EP0770)
elie@poltoraklaw.com

*Attorneys for Plaintiff*

43

## CERTIFICATE OF SERVICE

I, Erin Doherty, hereby certify that on April 9, 2012, copies of the annexed documents were caused to be served upon the following counsel of record at the addresses and in the manner indicated:

## VIA ELECTRONIC MAIL AND REGULAR MAIL

Jamie M. Brickell, Esq.
Jonathan T. Shepard, Esq.
Eric D. Dowell, Esq.
**PRYOR CASHMAN LLP**
7 Times Square
New York, NY 10036-6569
Tel: 212-421-4100
Fax: 212-326-0806
JBrickell@pryorcashman.com
JShepard@pryorcashman.com
EDowell@pryorcashman.com

*Attorneys for Defendants*
*Wi-LAN Inc.and Gladios IP Inc.*

Robert W. Forman, Esq.
**SHAPIRO FORMAN ALLEN**
**& SAVA LLP**
380 Madison Avenue, 25th Floor
New York, NY 10017
Tel: 212-972-4900
Fax: 212-883-1941
Forman@sfa-law.com

*Attorneys for Defendant*
*Paul J. Lerner, Esq.*

Dated:   April 9, 2012

Erin Doherty